**Fuller A. KIMBRELL and Reba Kimbrell,
Petitioners,**

v.

**COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.**

**No. 23112.**

United States Court of Appeals
Fifth Circuit.

Jan. 11, 1967.

Walter L. Mims, D. H. Markstein, Jr.,
Bainbridge & Mims, Birmingham, Ala.,
for petitioners.

Mitchell Rogovin, Asst. Atty. Gen.,
Christopher J. Ray, Atty., I. R. S., Rich-
ard M. Roberts, Acting Asst. Atty. Gen.,
Lee A. Jackson, Melva M. Graney, Marco
S. Sonnenschein, Attys., Dept. of Justice,
Washington, D. C., for respondent.

Before RIVES, GEWIN and BELL,
Circuit Judges.

RIVES, Circuit Judge:

Taxpayers, Fuller Kimbrell and his
wife, Reba Kimbrell, appeal from a de-
cision of the Tax Court holding them li-
able for deficiencies in income tax for the
years 1955 and 1956. We are asked to de-
termine whether the Tax Court erred in
finding that certain commission income
received during these years by two cor-
porations, allegedly controlled by Fuller
Kimbrell, was in fact earned by and tax-
able to the taxpayers.[1] The Commission-

---

1. Reba Kimbrell is involved solely because
she filed a joint return in 1955 and in

1956 with Fuller Kimbrell. She may be
disregarded for purposes of this opinion.

er, alleging that the two corporations were not engaged in any business activity but received income for services performed solely by Kimbrell determined that Kimbrell was liable for the tax on this income. In essence, the Commissioner contends that companies wishing to sell their products to the State of Alabama had to pay a commission to one of the two corporations, though the corporations performed no services for the potential sellers.

During the tax years in question, Fuller Kimbrell was Director of Finance of the State of Alabama and had authority to approve or disapprove purchases by the State from any particular individual or business concern. Contract Supply Company, Inc. of Fayette, Alabama (hereinafter called Contract), was organized as an Alabama corporation on April 15, 1955. Contract's shares of stock, having a $10 par value, were issued to its officers as follows:

T. E. Farned, President ...... 45 shares
E. J. Miller, Vice President ... 45 shares
Raymond C. Gordon,
    Secretary-Treasurer ..... 10 shares

Farned and Miller each received two certificates, one for 20 shares and another for 25 shares. The two 25-share certificates were endorsed by Farned and Miller in blank and given to Gordon, who was an accountant for Kimbrell. During the years 1955 and 1956, Contract received commissions totaling $10,140.69 from three corporations making sales to the State of Alabama. As of April 30, 1957, Contract's earned surplus was $6,-687.32. This amount and the capital stock were distributed to Farned, Miller and Gordon in the form of checks. The books of Contract showed the following explanation for some of these checks to the stockholders:

| | | |
|---|---|---|
| "7–15–57 | R. E. Farned Treasury purchase of stock | $ 537.46 |
| 7–15–57 | E. J. Miller Treasury purchase of stock | 1,537.46 |
| 7–15–57 | Raymond C. Gordon Treasury purchase of stock | 203.73 |
| 7–15–57 | E. J. Miller Payment of loan to Fuller A. Kimbrell for investment in stock— Chg. to F. A. K. | 500.00 |
| 7–15–57 | Raymond C. Gordon For transfer to Contractors Paint & Supply Co., Inc., Columbus, Miss. (and to close this bank account for Mr. Fuller A. Kimbrell) | 3,343.67" |

Gordon received additional checks totaling $565.00 and Farned received a check for $1000.00.

The Tax Court found that neither E. J. Miller nor T. E. Farned, friends of Kimbrell, ever saw the 25 shares endorsed in blank and delivered to Gordon,[2] and that they made no effort whatsoever to sell products of any company to the State. Furthermore, neither rendered any services of any kind to Contract.

Contractors Paint and Supply Company, Inc. (hereinafter called Contractors), the second corporation involved in this suit, was organized on April 5, 1955, as a Delaware corporation and registered to transact business in Alabama. Contractors' shares of stock, having a $10 par value, were issued as follows:

W. J. Thomson, Jr.,[3]
    President .............. 80 shares
D. F. Mobley,
    Vice President .......... 10 shares
Raymond Gordon .......... 10 shares

2. Probably meaning that neither Miller nor Farned ever knew what happened to the 25 shares and that they never again saw the stock certificates after the same were endorsed and delivered.

3. W. J. Thomson, Jr., a nephew of Kimbrell, managed a store owned by Kimbrell in Columbus, Mississippi. Mobley was a friend of Kimbrell.

Contractors received $44,082.09 in commission income during the taxable years 1955 and 1956 from various sales made by Minnesota Mining and Manufacturing Company to the State. As of April 30, 1957, Contractors had an earned surplus of $16,797.88.[4]

Substantially all of the assets of Contractors were disposed of in the following manner:

| Date | Description | Amount |
|---|---|---|
| 7–15–57 | Check for loan to Gordon | $ 600.00 |
| 9–20–57 | Payment to Corporation Service Co. | 50.00 |
| 9–20–57 | Payment of Federal taxes | 1,156.52 |
| 9–20–57 | Payment of State taxes | 89.95 |
| 10–23–57 | D. F. Mobley for stock | 1,779.79 |
| 10–29–57 | Check—L. V. Poole—stock in Coosa Motor Co. | 7,000.00 |
| 12–27–57 | Federal taxes | 49.98 |
| 1–25–58 | State taxes | 1.80 |
| 2– 6–58 | W. J. Thomson loan | 1,200.00 |
| 2– 7–58 | Check—L. V. Poole—stock in Coosa Motor Co. | 4,000.00 |
| 2– 8–58 | Balance in account | 74.19 |
| | | $16,002.23 |

The Tax Court found that Kimbrell and Gordon discussed the formation of Contractors and Gordon's attorney prepared the incorporation documents. Though Gordon did the accounting work for Contractors, he did not participate in sales transactions between Minnesota Mining and Manufacturing Company and the State of Alabama. Gordon testified that Kimbrell had primary responsibility for the commissions paid to Contractors.

There is further evidence that Kimbrell initiated the negotiations between sellers to the State and the two corporations. The testimony reveals that on June 17, 1955, Harry Heltzer, one of the managers of Minnesota Mining and Manufacturing Company, a distributor of reflective products, addressed a letter to Thomson, in care of Contractors, stating in part:

"This will advise you of the appointment of the Contractor's Paint and Supply Company of Columbus, Mississippi as a special distributor of our Reflective Products * * * to all departments and agencies of the State of Alabama. * * *

\* \* \* \* \* \*

"In the State of Alabama, bids will be executed and entered by our company on a direct basis. When, in such cases, our company is the successful bidder, commissions will be credited to your

4. According to the books and records of Contractors, a large portion of the expenses paid went to Thomson, Mobley and Gordon in the form of salary, auditing, and sales and travel expenses:

| Payee | Salary | Auditing & Accounting | Sales & Travel |
|---|---|---|---|
| W. J. Thomson, Jr | $9,600.00 | | $450.00 |
| D. F. Mobley | | | $2,400.00 |
| Raymond Gordon | | $3,015.75 | |

An additional $6,800.00 was paid as "salary" to Robert Bonner. The Tax Court found that Kimbrell told Gordon that "Bonner 'could do and had done us boys a number of favors,' that he needed money, and that [Kimbrell] wanted him to be paid money out of Contractors Paint and Supply, Inc." Kimbrell also authorized $1,050.00 to be paid to A. M. McNeil.

account corresponding to the discounts shown on the attached list, or, in the case of items not listed, commissions will be based on the amounts of reflective sheeting or other reflective products involved. Periodically, a tabulation and reconciliation will be made of your account.

"We are confident that cooperation between our companies will produce real results for both of us. We will appreciate your advising us by return mail of your acceptance of the terms of this arrangement."

Kimbrell had notified Heltzer that Contractors was a special distributor for reflective products in Alabama. The Tax Court found that Heltzer never met any of Contractors' employees, other than Thomson, and knew of no specific services that were rendered to Minnesota Mining by anyone associated with Contractors.

In June 1957, Kimbrell sold a store he owned in Columbus, Mississippi, to Thomson for $30,000 cash and 80 shares of Contractors. At the time of the sale, there was no dollar value set upon the assets of this Columbus store.[5]

Kimbrell did not report on his income tax return for 1955 and 1956 any of the commissions received by Contract or Contractors during those two years.[6] The Commissioner in his deficiency notice for 1955 increased Kimbrell's income by $41,517.41, which represented the commissions reported by Contract and Contractors, less an accounting fee of $500.00, legal and auditing expenses of $114.50, and office supplies of $10.79, incurred by the two corporations.[7] The Commissioner in his deficiency notice of 1956 increased Kimbrell's income by $10,614.30, which represented commissions and interest reported by both corporations, less $1,465.75 in accounting fees and $57.25 for office expenses.[8]

The Tax Court concluded that Contract and Contractors were mere depositories for commissions earned by Kimbrell. Kimbrell, asserting that the involved income was not earned by him, relies on the fact that Contract and Contractors were the payees of the commission checks. In effect, we are asked by Kimbrell to ignore the substance of the transactions because of the form taken by the commission payments. This we decline to do.

---

5. The John Deere Plow Company had arranged with Thomson to provide the $30,000 needed to purchase Kimbrell's store. The Company was never informed that the stock constituted part of the purchase price. At the time of the Tax Court proceedings, Kimbrell still owned the 80 shares in Contractors, which had not been legally dissolved.

6. Both Contract and Contractors filed income tax returns for the fiscal years ending April 30, 1956 and April 30, 1957.

7. 1955 Income for Contract ................................... $ 4,761.30
           for Contractors ............................... 37,381.38
                              Total .......... $42,142.68
1955 Expenses for Contract and Contractors     625.27
                                    $41,517.41

8. 1956 Income for Contract ................................... $ 5,379.39
           for Contractors
      $6,700.61 (Commissions)
          57.30 (Interest)         6,757.91
                                    $12,137.30
1956 Expenses for Contract and Contractors     1,523.00
                                    $10,614.30

Initially we must determine if Contract and Contractors are corporate entities for purposes of the income tax laws. The Supreme Court in Moline Properties v. Commissioner of Internal Revenue, 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943),[9] held that a corporate entity is deemed to exist if the corporation is organized to carry on a business activity or if, in fact, such activity has been carried on.[10] This Court in Tomlinson v. Mills, 5 Cir. 1963, 316 F.2d 710, 714, in recognizing the existence of a corporate entity noted:

> "There can be no doubt but that the parties, when they initiated the corporate setup, had the purpose that these activities would be carried on and it is equally certain that they were actually carried on, thus meeting both of the alternative requirements quoted above from the Moline Properties case."

■ The Tax Court did not err in holding that "neither Contract Supply Company, Inc., nor Contractors Paint and Supply Company, Inc., engaged in any business during the years 1955 and 1956."[11]

■ Each officer of Contract and of Contractor who testified stated that he did not perform any sales function, nor know of any services performed by his fellow officers or employees.[12] Furthermore, it seems that Minnesota Mining & Manufacturing Company did not anticipate or expect any services to be performed by Contractors.[13] Heltzer testified that the commissions were considered "sales expenses in getting the job done." Minnesota Mining continued to rely on the efforts of its own salesmen, who made direct sales to the State, and its own executive personnel who submitted bids for State contracts.

Kimbrell suggests that Contract and Contractors did engage in business, because each corporation executed contracts, hired employees, negotiated loans and collected interest thereon, and filed income tax returns. In the abstract, such activities indicate the type business activity required for a finding that a taxable corporate entity exists.[14] We would

9. Affirming Commissioner of Internal Revenue v. Moline Properties, Inc., 5 Cir. 1942, 131 F.2d 388.

10. In National Carbide Corp. v. Commissioner of Internal Revenue, 336 U.S. 422, 431–432, 69 S.Ct. 726, 93 L.Ed. 779 (1948), the Supreme Court in clarifying *Moline Properties* indicated that the corporate entity would be respected if business activity is carried on.

11. We are asked to hold that such corporations were a sham and organized to *evade* income taxes. We feel uncompelled to expressly say that these corporations were "a bald and mischievous fiction" or were unreal and nonexistent. Moline Properties v. Commissioner of Internal Revenue, 319 U.S. 436, 439, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943). Though abstaining from such bold characterizations, we do not *sub silentio* hold to the contrary. Clearly, the absence of business activity as envisioned by Moline Properties and its progeny enable us to disregard Contract and Contractors as taxable entities.

12. We reject Kimbrell's contention that the Tax Court committed reversible error in noting that Kimbrell's failure to call Thomson as a witness gives rise to the inference that, had Thomson been called, his testimony would have been unfavorable. Thomas E. Snyder Sons Co. v. Commissioner of Internal Revenue, 7 Cir. 1961, 288 F.2d 36, 39, cert. den., 368 U.S. 823, 82 S.Ct. 41, 7 L.Ed.2d 28; Stoumen v. Commissioner of Internal Revenue, 3 Cir. 1953, 208 F.2d 903, 907.

13. Referring again to Heltzer's letter to Thomson:
> "In the State of Alabama, bids will be executed and entered by our Company on a direct basis. When in such cases, our Company is the successful bidder, commissions will be credited to your account * * *."

14. Whether or not business activity may be said to have been carried on by a particular corporation depends on the evidence developed in the trial record. The cases cited in Kimbrell's brief do not support his proposition that Contract and Contractors conducted business activity. Those cases involved circumstances dissimilar to the facts here. See Mertens, Law of Federal Income Taxation, § 17.-05.

be judicially naive if we acquiesced in Kimbrell's argument, for in reality the suggested business activities were empty gestures. Some business activity, consisting of more substantial transactions than existed here, must be performed.

■ Evidence that Contract or Contractors performed services as a sales representative might reveal business activity within the *Moline Properties* test. Though not overlooking the language in National Carbide Corp. v. Commissioner of Internal Revenue, 336 U.S. 422, 433, 69 S.Ct. 726, 93 L.Ed. 779, which permits a dominated corporation to be a separate taxable entity, we cannot refrain from noting that Contract and Contractors were in reality set up to facilitate an obviously impermissible scheme.[15] Adopting a reasonable meaning of the *Moline Properties'* guiding phrase, we hold that there was no "carrying on of business" by Contract and Contractors.[16]

We are aware that *Moline Properties* and *National Carbide* refused to ignore as taxable entities even those corporations which were completely dominated by sole stockholders or parent corporations. In those two cases, however, the dominated companies, acting through their officers or stockholders, performed some activity which resulted in the involved income. We are not prepared to say that Contract and Contractors performed services which entitled them to be deemed earners of commission income. Admittedly, we de-emphasize the commission contracts between the sellers to the State of Alabama and the two corporations. These contracts, in themselves, may be sufficient services to the sellers, but we think not. Regardless of such quandaries, we do hold that neither corporation conducted the kind and amount of business activities to be a taxable entity.

■ Moreover, Kimbrell would be liable for commission income even if Contract and Contractors were carrying on business and, therefore, were taxable entities. An individual may select the corporate form as the means to conduct his business and provide his services. The benefits of utilizing a corporation are obvious, and the courts will refrain from questioning the rationality of the choice. Mertens, Law of Federal Income Taxation, § 17.05. For the corporation to be liable for taxes, however, it must have earned the income. Helvering v. Horst, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75 (1940); Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 184, 74 L.Ed. 668 (1930). The record indicates that Contract and Contractors performed no services to those companies making sales to the State of Alabama to justify our holding that they earned the sales commissions. Undoubtedly, Kimbrell earned the commissions, the two corporations (Contract and Contractors) being merely depositories or donees of his income.[17]

The decision of the Tax Court is affirmed on both grounds; that is, that neither corporation was carrying on a business, and that the commission income was earned by Kimbrell.

Affirmed.

---

15. We make no allusion to the legality or illegality of Kimbrell's activities, nor in any way suggest or intend to imply that a violation of State law was committed. Cf. Title 41, § 221, Code of Alabama (Recompiled 1958). Clearly, such a determination must be made, if at all, by the proper State authorities.

16. We set down no definite general rule but willingly pay homage to the principle that the corporate entity will be respected except "in exceptional situations where it otherwise would present an obstacle to the due protection or enforcement of public or private rights." New Colonial Ice Co. v. Helvering, 292 U.S. 435, 54 S.Ct. 788, 78 L.Ed. 1348 (1934).

17. There is no merit to Kimbrell's thesis that he is not taxable on income he did not receive. Helvering v. Horst, 311 U.S. 112, 117, 50 S.Ct. 184 (1940).