LOUIS G. HORN, III, AND JOANNE F. HORN, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Horn v. Commissioner
Docket Nos. 6025-76, 6026-76, 6027-76, 6028-76.
United States Tax Court
T.C. Memo 1982-741; 1982 Tax Ct. Memo LEXIS 5; 45 T.C.M. (CCH) 413; T.C.M. (RIA) 82741; December 28, 1982. *5 Two physicians formed a professional corporation (A) to engage in orthopedic surgery. A, from its inception, owned and operated X-ray equipment. Shortly thereafter, the physicians formed a subchapter S corporation (S) and transferred the X-ray equipment from A to S. They gave the stock in S to their children. When a third physician later joined A, his children also received stock in S. Held: (1) S was a sham. (2) A earned the X-ray income and incurred the expenses. (3) Distributions from S to the children, S' nominal shareholders, are constructive dividends to the three physicians. L. Bruce Ables, for the petitioners Vallie C. Brooks, for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Federal income taxes against the individual and corporate petitioners as follows: Docket
Taxable
No.
Year Ended
Deficiency
Louis G. Horn, III, and
6025-76
December 31, 1972
$2,589.11
Joanne F. Horn
December 31, 1973
5,370.58
Robert J. Hornsby and
6026-76
December 31, 1972
1,787.88
Florence W. Hornsby
December 31, 1973
4,150.59
H. Donald Beck and
6027-76
December 31, 1973
3,461.10
Katherine A. Beck
Huntsville Orthopedic
6028-76
June 30, 1972
2,214.18
Associates, P.A.
June 30, 1973
8,884.92
June 30, 1974
5,999.16
*6 These cases have been consolidated for trial, briefs, and opinion. Petitioners have conceded certain adjustments made in the notices of deficiency. The issues remaining for decision are as follows: (1) Whether Madison Medical Services, Inc. (hereinafter sometimes referred to as "Services"), was for tax purposes an entity separate from the corporate petitioner and, if so, whether respondent's determination to allocate all of Services' income and expenses to the corporate petitioner under section 482[2] was unreasonable, arbitrary, or capricious; and (2) Whether petitioner-husbands must include in their respective gross incomes amounts paid by Services to the children of the individual petitioners during the years in issue. FINDINGS OF FACT Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference. When the petitions in the instant cases were filed, petitioners Louis G. Horn, III (hereinafter sometimes referred to as *7 "Horn") and Joanne F. Horn, husband and wife, resided in Huntsville, Alabama; petitioners Robert J. Hornsby (hereinafter sometimes referred to as "Hornsby") and Florence W. Hornsby, husband and wife, resided in Jackson, Tennessee; petitioners H. Donald Beck (hereinafter sometimes referred to as "Beck") and Katherine A. Beck, husband and wife, resided in Huntsville, Alabama; and petitioner Huntsville Orthopedic Associates, P.A. (hereinafter sometimes referred to as "Associates"), a corporation, had its principal office in Huntsville, Alabama. General
Associates is a professional association incorporated by Horn and Hornsby under Alabama law in July 1970, to engage in the practice of orthopedic surgery. From July 1970 until about July 1972, Horn and Hornsby were the equal owners of all of Associates' stock. In July 1972, Beck became a shareholder of Associates and from July 1972 until July 1974, Horn, Hornsby, and Beck were the equal owners of all of Associates' stock. [3] *8 Horn, Hornsby, and Jerry W. Bevil (hereinafter sometimes referred to as "Bevil") were the directors of Associates from July 1970 until July 21, 1972. From July 21, 1972, through the remaining years in issue, Horn, Hornsby, and Beck were the directors of Associates. During the years in issue, Horn, Hornsby, and Beck (for the period that he was a shareholder) controlled Associates as directors and shareholders. From July 1970 through the years in issue, Horn and Hornsby were employed by Associates as physicians. [4] From about January 1, 1972, through the years in issue, Beck was employed by Associates as a physician. [5] *9 Before Associates was incorporated, Horn and Hornsby did their residency together, in orthopedic surgery, at the Campbell Clinic in Memphis, Tennessee. The first place they practiced orthopedic surgery was in Huntsville as employees of Associates. Orthopedic surgery is the surgical subspecialty concerned with the diagnosis and treatment of skeleton deformities, and diseases of and injuries to the bones, joints, and soft tissue adjacent to bones and joints in the human body. X-rays of a patient's body are considered an essential diagnostic tool by orthopedic surgeons. Some patients with fractures must first have their casts removed before X-raying is done. Since fractures are quite moveable, care must be taken in X-raying these patients.For these patients, it is more reasonable to have the X-ray facilities near the cast-setting facilities. As soon as Associates began its practice, it purchased its own X-ray equipment. This equipment was used by Associates from July 1970 until the incorporation of Services to take and develop X-rays of its patients prescribed by Horn and Hornsby. *10 The X-ray equipment owned by Associates was operated by Jacob Jones (hereinafter referred to as "Jones"), an X-ray technician and fulltime employee of Associates. When Jones was not performing his duties as an X-ray technician, he set casts for Associates, assisted the physicians in surgery, and performed other related duties. Sometime in August 1971, Associates moved to a new office suite with a room with lead-lined walls and plumbing specially designed for X-ray work. Associates' X-ray equipment was housed in this room. This room, together with a storage area for the X-rays, occupied perhaps one-fifteenth of Associates' office suite. Horn and Hornsby met with George A. Kronenberg (hereinafter sometimes referred to as "Kronenberg"), an attorney, and Bevil on a monthly basis to discuss the business operations of Associates.During these meetings, Horn and Hornsby discussed the advantages of forming a small business corporation under subchapter S of chapter 1 (hereinafter sometime referred to as "a subchapter S corporation") to provide the X-ray services to Associates. Horn and Hornsby had the following reasons for forming such a corporation: (1) to accumulate funds for the education *11 of their children; and (2) to act on the advice of Kronenberg and Bevil regarding the tax advantages of a subchapter S corporation. Organization and Operation of Services
Sevices was incorporated on September 14, 1971, under Alabama law. Its certificate of incorporation appears to permit Services to engage in almost any type of service, management, construction, investment, manufacturing, or sales business. This certificate does not suggest that Services was expected to engage in X-ray laboratory work or in any particular related activity. On October 1, 1971, Associates transferred its X-ray equipment to Services at its then book value ($3,630.45). Services borrowed from Associates' profit-sharing plan the funds it used to pay Associates for the X-ray equipment. The X-ray equipment remained in the same location in Associates' offices that it had previously occupied. After this transfer, Jones continued to perform his X-ray duties in the same manner as he previously had. He also continued to set casts and assist in surgery as before. He was carried on Services' payroll for his duties as an X-ray technician and on Associates' payroll for his duties as a cast setter. [6] Also, *12 he was paid by Associates for his assistance in surgery. Jones was the only employee on Services' payroll until late 1973, when he voluntarily terminated his employment. Two technicians were hired to replace Jones. As was the case with Jones, these two technicians were on Services' payroll and also worked part-time for Associates. The decision to hire these employees was made by Horn, Hornsby, and Beck. In September 1972, Services acquired additional X-ray equipment at a cost of $5,546.85. [7] *13 This amount, like the amount used to acquire Associates' X-ray equipment, was borrowed from Associates' profit-sharing plan. When a bank succeeded Bevil as trustee for Associates' profit-sharing plan, Bevil or Kronenberg advised Horn, Hornsby, and Beck to repay Services' loans from Associates' profit-sharing plan. Another bank lent Services an amount equal to the amount of Services' remaining debt to Associates' profit-sharing plan, and Services repaid this loan. A typical X-ray transaction occurred as follows: When one of Associates' physicians determined that a patient needed an X-ray, the physician raised a flag outside the examining room to indicate that an X-ray was needed. The physician also wrote an order for the X-ray and placed it in the chart in the examining room door. On seeing the flag, one of Associates' employees usually took the patient, who was usually wearing an examining gown, to the room containing the X-ray equipment. The X-ray technician then took charge of the patient. After the X-ray technician completed the X-ray, the patient was escorted back to the examining room by one of the Associates' employees and, in some cases, by the X-ray technician. An employee of Associates or Services carried the X-ray to Associates' X-ray reading area. The physician read the X-ray and then went back to the examining room and consulted with the patient. with the patient. Thereafter, the X-rays were stored in an X-ray file room next to the X-ray equipment room. Services did not maintain any log of the X-rays taken or any *14 patient cards. Associates maintained the patients' records which listed the type of X-ray made and fee charged. In 1971, 40 to 50 X-rays were made each day. In 1972 and after, 70 to 80 X-rays were made each day. Services did not bill, or collect anything from, the patients. Associates billed its patients for all X-ray services rendered and, on a monthly basis, remitted a percentage of the gross charges to Services. In the beginning, Associates remitted to Services an amount equal to 22 percent of the gross charges billed. Within a year, this was changed to 30 percent of the gross charges billed. These charges were paid by Associates whether or not Associates collected the full gross charge from the patient. At the first meeting of shareholders, on September 14, 1971, Horn, Joanne F. Horn, Hornsby, and Florence W. Hornsby were elected directors of Services. On the same day, the directors elected Hornsby as president and Horn as secretary-treasurer. [8] From the organization of Services in September 1971 and during each of the years in issue Horn, Hornsby, and Beck served as officers and directors of Services [9] and provided its management, including the hiring and control of its *15 employees. Horn, Hornsby, and Beck also retained the accountants who maintained the books and records of Services, and who were the same accountants as maintained the books and records of Associates. The rate to be paid Services by Associates for X-ray work was determined by Horn *16 and Hornsby during a meeting with Kronenberg and Bevil. The percentage was based on what Horn and Hornsby considered to be the community rate for a professional charge, the bad debt experience of Associates, and an amount of overhead for billing and office space which Associates provided otherwise free of charge. Horn and Hornsby did not solicit X-ray business for Services. On several occasions, however, Services made and developed X-rays for Horton Smith (hereinafter sometimes referred to as "Smith"), a doctor at the Huntsville Hospital who was doing research in fertility. Associates charged Smith about 80 percent of what Huntsville Hospital would have charged. Associates billed Smith, remitted to Services 30 percent of what Smith paid and retained the remainder. Also, on occasion Services allowed physicians in the same building as Associates had its offices to use its equipment when the equipment of those physicians broke down. Usually, no charge was made for such services and those physicians allowed Associates to use their X-ray equipment at no charge when Associates' X-ray equipment was not usable. During the years 1971 through 1974, Services did not maintain any separate *17 office, post office box, or telephone nor did it carry any type of insurance. Associates paid the premiums for the liability insurance which covered its physician members and other employees against claims for injuries inflicted through X-rays. After Services was incorporated and the X-ray equipment transferred, Associates continued to pay for this liability insurance at the same premium rate. During these years, Services did not advertise nor was iot listed in the local telephone directory; it was not licensed by any local or State authority to do any kind of business; [10] Services did not pay rent to Associates for the space it occupied nor did it pay any portion of the utilities or overhead expenses connected with the space; and patients were not aware of Services as a separate corporation. In August 1977, Associates moved to larger offices located in Huntsville. The X-ray equipment was moved to these new offices. A physical thereapist *18 was hired, and Services billed the physical therapy patients. The physical therapist had a telephone which was listed in the phone directory under Services' name. On August 29, 1977, Services entered into a lease with Associates to rent the space it then occupied in Associates' offices. On its income tax returns for 1972 and 1973, Services reported gross income, deductions, and taxable income as shown in table 1. Table 1 1972
1973
Gross Income
$27,817.07
$46,588.30
Deductions
Salaries and wages
$ 4,431.05
$ 5,719.73
Repairs
322.55
Taxes
402.78
1,293.57
Interest
245.07
1,629.77
Depreciation
800.49
1,767.97
(X-ray equipment)
Supplies
8,225.47
8,362.16
Office supplies/expenses
70.70
6.15
Legal and accounting
483.75
530.00
Total deductions:
$14,659.31
$19,631.90
Taxable income:
$13,157.76
$26,956.40
Services' taxable year began January 1 and ended December 31. Associates' taxable year began July 1 and ended June 30. Both Services and Associates used the cash basis method of accounting. Associates claimed deductions on its income tax returns for X-ray and laboratory expenses in the amounts of $18,573.90 for its 1972 taxable year, $38,527.08 for its 1973 taxable year, and $46,555.32 for its 1974 taxable year. The X-ray *19 expense portions of these amounts were paid by Associates to Services. In the notice of deficiency issued to Associates, respondent determined that all of Services' income and deductions for the years involved must be reported by Associates. The following explanation was attached to the notice of deficiency: (a) In the tax years ended June 30, 1972, June 30, 1973 and June 30, 1974 gross income earned, and deductions incurred, by you in the conduct of an x-ray service business were not reported by you and were improperly reported by Madison Medical Services, Inc., a corporation owned or controlled by your stockholders. Under the authority of sections 61 and 482 of the 1954 Code your taxable income is increased by the amounts of $6,107.29, $23,837.59 and $22,528.39 for the tax years ended June 30, 1972, June 30, 1973 and June 30, 1974, respectively, as shown below. It is determined that this action is necessary to prevent the evasion of taxes or to clearly reflect income. 6-30-72
6-30-73
6-30-74
Net income 9-1-71 to 12-31-71
$ 771.08
Net income 1-1-72 to 6-30-72
5,336.21
Net income 7-1-72 to 12-31-72
$ 7,821.55
Net income 1-1-73 to 6-30-73
16,016.04
Net income 7-1-73 to 12-31-73
$10,940.36
Net income 1-1-74 to 6-30-74
11,588.03
Totals
$6,107.29
$23,837.59
$22,528.39
Services' *20 net income for any of Associates' taxable years in issue is as set forth in the notice of deficiency explanation, supra.
Ownership of Services
Horn and Hornsby each contributed $500 to start Services. Listed as Services' original incorporators, however, were Kronenberg, Bevil, Cathy Scott, and Earle B. Selfe. [11] *21 Services was organized with 5,000 shares of authorized, no par capital stock. A total of 1,000 shares was held on September 14, 1971, by Kronenberg, Bevil, and Cathy Scott, who thereupon quitclaimed their respective shares equally to Joanne F. Horn and Florence W. Hornsby, petitioner-wives. One-half of this stock was transferred to Horn's sons, Louis G. Horn, IV, and Joseph F. Horn (hereinafter sometimes referred to as "Louis" and "Joseph", respectively) and the other half to Hornsby's daughter, Mary E. Hornsby (hereinafter sometimes referred to as "Mary"); each child's stock was in the name of that child's mother as custodian under the Alabama Uniform Gifts to Minors Act. On October 8, 1971, Services elected (see n. 14, infra) to be treated as a subchapter S corporation. The shareholder consents were made by Joanne F. Horn, as custodian for Louis and Joseph, and Florence W. Hornsby, as custodian for Mary. In early 1972, Amy K. Hornsby (hereinafter sometimes referred to as "Amy") was born to Hornsby and Florence W. Hornsby. On April 25, 1972, 250 of Mary's shares were transferred to Amy. [12] Florence W. Hornsby was custodian of Amy's stock under the Alabama Uniform Gifts to Minors Act. As a result of this transfer, each of the four children was the listed owner of 250 shares of Associates. The decision to transfer shares from Mary to Amy was made by Hornsby and Florence W. Hornsby in order to give Amy the same number of shares as Mary. On December 1, 1972, *22 one-third of the shares of each of Horn's children and Hornsby's children was transferred in equal amounts to Beck's three children, Henry D. Beck, III, James P. Beck, and Katherine A. Beck (hereinafter sometimes referred to as "Henry", "James", and "Katherine", respectively). [13] Petitioner Katherine A. Beck was custodian of Henry's, James', and Katherine's stock under the Alabama Uniform Gifts to Minors Act. Horn and Hornsby decided to transfer this stock to Beck's children because Beck felt, and Horn and Hornsby agreed, that as a member of Associates, Beck was entitled to give a share of Services' income to his children. The stock was transferred for a price equal to a proportionate share of the book value of Services' assets. Table 2 compares the shareholdings in Services on September 14, 1971 (after Louis, Joseph, and Mary became the listed owners), April 25, 1972 (after Amy became a listed owner), and December 1, 1972 (after Beck's children became listed owners). *23 Table 2 Name of Shareholder
Sept. 14, 1971
Apr. 25, 1972
Dec. 1, 1972
Louis
250
250
166 2/3
Joseph
250
250
166 2/3
Mary
500
250
166 2/3
Amy
250
166 2/3
Henry
111 1/9
James
111 1/9
Katherine
111 1/9
1,000
1,000
1,000    In July 1974, when Hornsby withdrew from Associates, Services redeemed its stock held in the names of Mary and Amy for an amount reflective of a proportionate share of the book value of Services' assets. This redeemed stock was held as treasury stock until July 1976. At that time, Horn and Beck decided to allow Burnside to purchase this treasury stock. (See n. 5, suspra.) Burnside held this stock in his own name until on or about June 30, 1977, when he transferred it to his children. Services' taxable income was distributed on its books and records among its listed shareholders (and reported on their Federal income tax returns) as indicated in table 3. Table 3 Services' Taxable Income
Shareholder
1971 [1]
1972
1973
Louis
$192.77
$ 2,637.65
$ 4,492.55
Joseph
192.77
2,637.65
4,492.82
Mary
385.54
2,637.64
4,492.55
Amy
2,637.64
4,492.82
Henry
869.06
2,995.13
James
869.06
2,995.13
Katherine
869.06
2,995.40
$771.08
$13,157.76
$26,956.40
The actual cash distributed *24 by Services to its listed shareholders during 1972 and 1973 is reflected in table 4. Table 4 Cash Distributed
Shareholder
1972
1973
Louis
$1,334.05
$ 4,166.65
Joseph
1,334.05
4,166.67
Mary
1,334.05
4,166.65
Amy
1,334.06
4,166.68
Henry
2,777.78
James
2,777.79
Katherine
2,777.79
Total
$5,336.21
$25,000.01
All of the taxpayers involved in the instant cases were on the cash basis of accounting for Federal income tax purposes for the years in issue. In the notices of deficiency issued to Horn, Hornsby, and Beck, respondent determined that the cash distributions by Services to each of the listed shareholders constituted dividend income to that shareholder's parents. For the years in issue: (1) Services was not formed for a business purpose; (2) Services did not carry on an X-ray business; (3) Services was not a taxable entity separate from Associates; (4) Services and Associates were commonly controlled by Horn, Hornsby, and Beck; (5) Services' and Associates' activities constituted an integrated business enterprise; (6) Associates was the true earner of the net X-ray income; and (7) the distributions from Services to the individual-petitioners' children personally benefited the petitioner-husbands. OPINION *25 I. Associates
Respondent contends that Services was a sham because it did not engage in any substantive business activity and lacked any substantial business purpose. [14] *26 Further (respondent argues) the X-ray income was earned by Associates and, under section 61, is taxable to Associates. In the alternative, if the Court concludes that Services was a separate entity for Federal income tax purposes, then respondent contends that 100 percent of Services' income and expenses should be allocated to Associates under section 482. [15] Respondent urges, under all of these analyses, that the activities of Associates and Services constitute a single, integrated business enterprise and accordingly, all of Services' income earned and Services' deductions paid or incurred during Associates' 1972, 1973, and 1974 taxable years must be included in Associates' taxable income for these years. Petitioners contend that Services was independent of and separate from Associates because it was incorporated for legitimate business reasons and carried on business activity after incorporation, and that Services was the true *27 earner of the X-ray income. In response to respondent's alternative argument, petitioners argue that an allocation of 100 percent of Services' income and expenses to Associates under section 482 is arbitrary, capricious, and unreasonable. We agree with respondent that Services was a sham and that Associates was the true earner of the X-ray income, and so we do not reach a decision as to any of the alternative arguments relating to section 482. A. Sham Corporation
Taxpayers have the right to mold business transactions in such a manner as to minimize the incidence of taxation. See Gregory v. Helvering,293 U.S. 465, 469 (1935). The government, however, is not required to acquiesce in the chosen form if the form is unreal or a sham. In such cases, the form may be disregarded. Higgins v. Smith,308 U.S. 473, 477 (1940). A corporation is to be recognized as a separate taxable entity if (1) the purpose for the formation of the corporation is the equivalent of business activity or (2) the incorporation is followed by the carrying on of business. Moline Properties v. Commissioner,319 U.S. 436, 438-439 (1943); Achiro v. Commissioner,77 T.C. 881, 901 (1981). If neither requirement is *28 met, the corporation is to be declared a sham and all income is to be attributed to the true earner. Shaw Construction Co. v. Commissioner,35 T.C. 1102, 1114-1117 (1961), affd. 323 F.2d 316 (CA9 1963). Petitioners have the burden of proving that Services is a separate entity for tax purposes. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). [16] We are persuaded that Services was not formed for a purpose which is the equivalent of business activity and that it did not carry on business after its incorporation.
1. Business purpose
The testimony of Horn [17] *29 and Hornsby describes the following four purposes for the formation of Services: (1) to accumulate funds for their children's education; (2) to act on the advice of their attorney and accountant regarding the tax advantages of forming a subchapter S corporation; (3) to improve their personal credit by limiting their liability for loans used to purchase X-ray equipment; and (4) to resolve a personality conflict between Jones and Associates' office manager. The first purpose (to accumulate funds for the education of Horn's children and Hornsby's children) is personal to Horn and Hornsby; it does not represent any business interests of Associates. This purpose is not the equivalent of business activity and thus, not a reason for holding that Services is a separate taxable entity. The second purpose (obtaining the tax advantages of a subchapter S corporation) is of no help to petitioners, since "Escaping taxation is not a 'business' activity. See National Investors Corp. v. Hoey,144 F.2d 466. " National Carbide Corp. v. Commissioner,336 U.S. 422, 437 n. 20 (1949). The third purpose (limitation of personal liability) in many cases does constitute a valid business purpose. Davis v. Commissioner,64 T.C. 1034, 1044 (1975). In the instant cases, however, Horn's and Hornsby's personal liabilities for Associates' debts were already limited by virtue of Associates' corporate status. Nothing in the record shows that Services' incorporation added to the protection that Horn and Hornsby already enjoyed. Under the circumstances, we do not believe that this asserted purpose was in fact *30 a purpose for Services' incorporation but was, at most, a plausible afterthought. Aldon Homes, Inc. v. Commissioner,33 T.C. 582, 598 (1959). The fourth purpose (resolving a personality conflict between the X-ray technician and the office manager) is also not the equivalent of a business activity. Surely it is not the ordinary business response to a conflict between two employees to establish a separate corporation to hire one of the employees. In the instant cases, Jones, the technician, continued to do after Services' incorporation the same things he was doing before. The record discloses no change, except as to the source of Jones' compensation, and even this change does not appear relevant to the asserted personality conflict since Jones continued to be paid by Associates for at least part of his services. We do not believe that this asserted purpose was in fact a purpose for Services' incorporation; it was, at most, an afterthought. We conclude that Services was not formed for a purpose which is the equivalent of business activity. Petitioners rely on Davis v. Commissioner,supra, and suggest that there are only slight factual distinctions from the instant cases. Petitioners *31 maintain that Davis should control and that the purposes for forming Services should be held to be business purposes. In Davis, respondent conceded that the X-ray and physical therapy service corporations were not shams or fictions, conceded that the transfers of stock to Davis' children had substance and should be recognized, and did not contend that the additional corporations were not viable business entities. (64 T.C. at 1042, 1043). The opposite is true in the instant cases. In Davis, respondent relied on Gregory v. Helvering,supra, to challenge the taxation of the income to the corporations rather than to Davis "on the grounds that his purpose in organizing the corporations was solely tax motivated." (64 T.C. at 1043). We concluded that Davis proved that the corporations were not formed solely for tax purposes. We note that Davis had been operating his medical practice, including the X-ray and physical therapy activities, as a sole proprietorship. By incorporating these activities, Davis limited his hitherto unlimited liability. In the instant cases, Horn and Hornsby already had limited their liabilities by forming Associates. [18] *32 Thus, both the facts and the legal issues of Davis are different in critical respects from those of the instant cases and accordingly we conclude that Davis is distinguishable. 2. Carrying on a business
A corporation is not treated as carrying on a business merely because it engages in certain corporate formalities such as holding corporate meetings, adopting by-laws, electing officers and directors, issuing securities, and keeping separate books. See Aldon Homes, Inc. v. Commissioner,33 T.C. at 600. Further, a corporation is not treated as carrying on a business if its activities such as executing contracts, hiring employees, negotiating loans, and filing tax returns (which in the abstract *33 are indicia of carrying on a business) are merely "empty gestures" rather than substantial transactions. Kimbrell v. Commissioner,371 F.2d 897, 901-902 (CA5 1967), affg. a Memorandum Opinion of this Court. [19]
However, a corporation which in addition to engaging in corporate formalities holds itself out to unrelated third parties and engages in substantial business activities will be held to have carried on a business. Skarda v. Commissioner,250 F.2d 429, 434-435 (CA10 1957), affg. 27 T.C. 137 (1956). In Skarda, the corporation, the Chronicle Publishing Company, opened up a bank account in its own name, secured credit in its own name from an independent bank, and published a newspaper under its own name, as well as hired employees, secured an employee identification number, and filed Federal income tax returns. Skarda v. Commissioner,250 F.2d at 434. The Court of Appeals for the Tenth Circuit affirmed this Court's holding that this constituted carrying on a business. The following factors point toward the conclusion that Services did not carry on a business after its incorporation: (1) Services did not obtain credit from an unrelated third party such *34 as a bank. Rather, Services borrowed funds from the profit-sharing plan of Associates (a corporation with directors and shareholders common to Services) on two occasions to obtain X-ray equipment from Associates and purchase other equipment. [20] (2) Services did not pay for its own rent, utilities, and overhead. (3) Associates, not Services, paid the insurance premium for insurance coverage for liability arising from the X-ray services. (4) Services was not issued a license in its own name for operating X-ray equipment. [21] *35 (5) Services did not maintain any log of X-rays taken or any patient cards. (6) Associates' patients were unaware of Services' existence. (7) The X-ray equipment was located in Associates' offices. (8) Services did not advertise or list in the local telephone directory. The following factors point toward a conclusion that Services carried on a business: (1) The X-ray business was an active one, involving initially 40-50 X-rays per day and, beginning in 1972, 70-80 X-rays per day. (2) Services performed X-ray services for Smith for a discounted fee. [22] *36 (3) The X-ray equipment was operated by a technician employed by Services to perform such services. (4) Services filed its Federal income tax forms. Based on the record in the instant cases, we conclude that Services did not carry on a business after its incorporation. Petitioners rely on Skarda v. Commissioner,supra. As our discussion of Skarda and our recital of factors show, the record in the instant cases is different from what we found in Skarda, in ways that in the aggregate require us to conclude that Skarda helps respondent and not petitioners. Petitioners argue that Services should be recognized as a separate taxable entity because the transfers of Services' stock to Horn's children, Hornsby's children, and Beck's children were bona fide transfers and petitioner-wives were fiduciaries under Alabama law. As we understand *37 this argument, petitioners suggest that because Associates and Services did not have common shareholders, they are separate entities. We have found that Services and Associates were commonly controlled by Horn, Hornsby, and Beck. The question of whether Services carried on a business separate from Associates is not significantly affected by the bona fides of gifts of securities, but rather depends on what Services did, taking into account our finding of common control. We conclude that petitioners' analyses of the fiduciary obligations of petitioner-wives is essentially irrelevant in light of the record in the instant cases. As indicated in note 17, supra, the instant cases were tried in connection with Bell v. Commissioner,T.C. Memo 1982-660. We held that the activities in Bell constituted the carrying on of a business. The principal differences between the instant cases and Bell are that in the instant cases Services (1) borrowed from Associates' profit-sharing plan--rather than an independent creditor--to acquire its X-ray equipment (see n. 20, supra); (2) did not receive a license or permit from any governmental entity authorizing it to engage in a business (it was apparently *38 doing the same things for which the second corporation in Bell did obtain governmental authorization); and (3) did not maintain its own record of its only asserted business activity, i.e., a record of the X-rays taken. These differences tip the scales in respondent's favor in the instant cases. In some respects, petitioners observed Services' separate identity; however, petitioners ignored Services' separate identity in too many respects for us to honor it in the instant case. Cf. Achiro v. Commissioner,77 T.C. at 902-903. B. Assignment of Income
Respondent, relying on Lucas v. Earl,281 U.S. 111 (1930), contends that Associates is the true earner of the net income derived from the X-ray business. Respondent claims that the X-ray services were rendered through Associates' officers and employees and the use of its facilities. Therefore, respondent concludes, Associates should be taxed on this income. [23]
Petitioners *39 argue that Services is the true earner of the X-ray income because it owned the capital items and employed the X-ray technician. We have concluded that Services' separate corporate existence was a sham and we have found that Associates was the true earner of income from the X-ray business. Accordingly, we conclude that Associates is taxable on the income from the X-ray business. We hold for respondent on this issue. II. Constructive Dividends
Respondent argues that if Services' income is allocated to Associates, then Services' distributions to Horn's children, Hornsby's children, and Beck's children constitute constructive dividends to Horn, Hornsby, and Beck. Petitioners argue that the distributions by Services are not taxable to Horn, Hornsby, and Beck because they were not the shareholders of Services. Rather, petitioners argue, the transfers of Services' stock to the children were bona fide transfers and the children were the true owners of Services. Therefore, petitioners conclude, all distributions by Services are taxable to the children. To begin with, the actual distributions of funds by Services must be treated as deemed distributions by Associates. This follows from *40 our holdings that Services is a sham and that Associates is the true earner of the income. See Engineering Sales, Inc. v. United States,510 F.2d 565, 569 (CA5 1975). Transfers of corporate funds for the purposes of directing income to children of controlling shareholders provide such shareholders with direct, personal benefits. Engineering Sales, Inc. v. United States,510 F.2d at 570. Since a purpose of creating Services was to direct income to Horn's children, Hornsby's children, and Beck's children, we conclude that the distributions to the children were for the direct, personal benefit of Horn, Hornsby, and Beck and constitute taxable, constructive dividends to them. We hold for respondent on this issue. Decisions will be entered for the respondent.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Robert J. Hornsby and Florence W. Hornsby, docket No. 6026-76; H. Donald Beck and Katherine A. Beck, docket No. 6027-76; and Huntsville Orthopedic Associates, P.A., docket No. 6028-76.↩
2. Unless indicated otherwise, all section, subchapter, and chapter references are to sections, subchapters, and chapters of the Internal Revenue Code of 1954 as in effect for the taxable years in issue.↩
3. The first sentence of the parties' stipulation paragraph 8 states that Horn and Hornsby each owned one-half of Associates until about December 1, 1972. The second sentence of the same stipulation indicates that Beck became a one-third owner of Associates about July 1, 1972. The parties have not favored us with a reconciliation of these two sentences insofar as they apply to the period from about July 1, 1972, through about December 1, 1972, but Beck's testimony suggests that it is more likely that the second sentence of the stipulation is correct than that the first sentence of the stipulation is correct.
4. Hornsby withdrew as an employee of Associates in July 1974. ↩
5. In July 1975, Richard C. Burnside (hereinafter sometimes referred to as "Burnside") was hired by Associates as a physician. In July 1976, he became an equal owner, along with Horn and Beck, of all of Associates' stock.
6. So stipulated. The parties do not attempt to reconcile this stipulation with Horn's stestimony that Jones was paid by Services for all the work Jones did during regular working hours.↩
7. Major equipment purchase decisions were made by Horn, Hornsby, and Beck; day-to-day purchases of X-ray supplies and repairs were made by the X-ray technician.
8. On December 26, 1974, shortly after respondent commenced audits in the instant cases, Horn and Hornsby resigned as directors and Joanne F. Horn, Katherine A. Beck, and Carolyn Hicks were elected directors of Services. Also, Joanne F. Horn was elected as president and vice president and Katherine A. Beck was elected as secretary-treasurer. Carolyn Hicks resigned as director on July 1, 1975, whereupon Connie Burnside was elected to take her place. Services' minute book does not reflect any entries after the September 14, 1971, meetings and before the December 26, 1974, meeting; also it does not include any entry stating that Florence W. Hornsby's directorship ended. ↩
9. So stipulated. Other stipulated exhibits indicate that Beck was neither an officer nor a director initially. It seems to be clear that, no later than sometime in the latter half of 1972, Beck assumed a role in the governance of Associates.↩
10. The record does not indicate whether Jones or any of his successors was a licensed radiologist or whether the requirements of Alabama law as to X-rays of people were satisfied by Horn, Hornsby, or Beck having "supervised" the X-ray technician.↩
11. So stipulated. The stipulated certificate of incorporation shows an Earl B. Self as one of the original directors and as a notary public on an affidavit by Kronenberg that was attached to Services' certificate of incorporation, but shows only Kronenberg, Bevil, and Cathy Scott as the incorporators. The parties have not favored us with an explanation of this conflict between the stipulation and the stipulated exhibit.
12. In April 1972, a shareholder consent was filed on behalf of Amy (by Florence W. Hornsby as custodian) so as to continue subchapter S status for Services. (See n. 14, infra.↩)
13. In December 1972, shareholder consents were filed on behalf of Henry, James, and Katherine (by petitioner Katherine A. Beck as custodian) so as to continue subchapter S status for Services. (See n. 14, infra.↩)
1. The 1971 tax year was from September 14, 1971, through December 31, 1971.↩
14. The parties have stipulated that "On October 8, 1971, Services filed an election * * * along with appropriate consents of the shareholders to be taxed as a small business corporation under the provisions of section 1372". They have also stipulated that in April 1972, and December 1972, "appropriate consents of the new shareholders were filed" on account of the additions of Amy, Henry, James, and Katherine as shareholders of Services. We do not consider these stipulations to constitute a concession by respondent that Services should be recognized for tax purposes as a separate corporation or that Horn's children, Hornsby's children, and Beck's children should be treated as the real owners of Services' stock. See sec. 1.1373-1(a)(2), Income Tax Regs.↩ Rather, we consider these stipulations to constitute an agreement by the parties that, if Services is to be recognized for tax purposes as a separate corporation, then it is to be treated as having been a subchapter S corporation from its inception through the years in issue. 15. Respondent also argues that if the Court does not sustain the 100-percent allocation, then any income found to have been taxable to Services is income to Horn, Hornsby, and Beck as the true owners of Services' stock pursuant to section 1373.↩
16. Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice and Procedure.↩
17. The parties have agreed that Horn's testimony in Bell v. Commissioner,T.C. Memo. 1982-660, is incorporated as part of the record in the instant cases.
18. We do not understand petitioners' arguments to focus on efforts to limit malpractice liability, which was a significant element in Davis.↩ However, if petitioners intend their argument to apply to malpractice as well as to contract liability, we note that Associates continued to pay the premiums for the liability insurance that covered the physicians and other employees against claims on account of injuries inflicted through X-rays. In this respect also, we conclude that limitation of liability was not a purpose for the formation of Services.
19. T.C. Memo. 1965-115↩.
20. Services ultimately borrowed from a bank to pay off its loans from Associates' profit-sharing plan. The record does not indicate whether this took place during any of the taxable years before the Court. As to Services' borrowing from Associates' profit-sharing plan, no question is raised in the instant cases to possible application of section 503 (relating to prohibited transactions), as it was before enactment of section 2003(b) of the Employee Retirement Income Security Act of 1974, Pub. L. 93-406, 88 Stat. 829, 978.↩
21. During the years in issue, Alabama law required individuals and corporations receiving, possessing, using, transferring, owning, or acquiring radioactive material to obtain a license from the Alabama State Board of Health. Ala. Code sec. 22-14-6↩ (1975); Ala. Dept. of Public Health, Regulations for Control of Radiation (1974).
22. However, Smith was billed only by Associates, which then remitted to Services 30 percent of what Smith paid. There is no evidence that Associates acted as Services' agent, or that the 70 percent it retained was merely a commission. As a result, this factor is far less significant than it would be if Services dealt with Smith and received Smith's payment. Petitioners assert that Services also performed X-ray services for other physicians. Horn and Hornsby testified that other physicians did use the X-ray equipment when the equipment of these physicians broke down, but also testified that these other physicians were not charged for the use of Services' X-ray equipment. We do not regard this particular informal unpaid neighborliness as a factor indicating that Services was carrying on a business.
23. Respondent does not argue that we should treat Horn, Hornsby, and Beck (rather than Associates) as the true earner of Services' income, in contrast to the position he has taken in cases such as Pacella v. Commissioner,78 T.C. 604, 613 (1982), and Davis v. Commissioner,supra.↩