T.C. Memo. 2002-127


UNITED STATES TAX COURT


ZABETTI A. PAPPAS, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 24593-95.                    Filed May 23, 2002.


Zabetti A. Pappas, pro se.

<u>Lyle B. Press</u> and <u>David A. Williams</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, <u>Judge</u>:  Respondent determined deficiencies and
additions to tax in petitioner's Federal income taxes as follows:

|        |            | Additions to Tax |            |
| Year   | Deficiency | Sec. 6651(f)[1]  | Sec. 6654(a) |
|--------|------------|------------------|------------|
| 1989   | $21,867    | $16,400          | $1,478     |
| 1990   | 19,575     | 14,681           | 1,287      |
| 1991   | 3,873      | 2,905            | 224        |
| 1992   | 4,017      | 3,013            | 175        |

After concessions,[2] the issues for decision are as follows:
(1) Whether amounts paid to or received by Real Services, Inc.,
during 1989 and 1990 are properly treated as petitioner's taxable
income; (2) whether petitioner failed to report income received
in connection with an "escort" business during 1989 and 1990; (3)
whether petitioner failed to report income she received through
embezzlement and/or fraudulent loan transactions during 1989 and

---

[1] Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the taxable years in
issue, and all Rule references are to the Tax Court Rules of
Practice and Procedure.

[2] In connection with the pretrial proceedings in this case,
respondent was deemed to have conceded his determinations that
petitioner had unreported income of $4,640 in 1990 as a result of
a transaction with an individual identified as Harvey K. and
unreported income of $1,500 as a result of a transaction with one
Dennis T.  Additionally, on brief, respondent has conceded his
determination that petitioner had unreported income of $1,030 as
a result of a transaction with an individual identified as
Ricardo S.

The determinations in the deficiency notice included amounts
of self-employment taxes for the years in issue.  Petitioner has
not specifically contested the applicability of these taxes, and
we deem that she has conceded this issue.  The amount of self-
employment taxes, and the commensurate deductions for those
taxes, are to be determined in accordance with our conclusions
herein regarding petitioner's unreported income.

1990; (4) whether petitioner failed to report sales and rental income she received during 1989 and 1990; (5) whether petitioner may deduct business expenses in excess of those allowed by respondent for 1989 and 1990; (6) whether respondent properly reconstructed petitioner's 1991 and 1992 taxable income through the use of Bureau of Labor Statistics data; (7) whether petitioner is liable for the additions to tax under section 6651(f) or, in the alternative, for the additions to tax under section 6651(a) for the years at issue; and (8) whether petitioner is liable for the additions to tax under section 6654(a) for the years at issue.

## FINDINGS OF FACT

Petitioner Zabetti A. Pappas was a resident of New York, New York, at the time the petition herein was filed. She did not file Federal income tax returns for the taxable years at issue, nor did she make estimated tax payments for those years.

## 1. Petitioner and Real Services, Inc.

Petitioner attended Vassar College from 1976 through approximately 1978. Thereafter, she held a variety of jobs, including operating a business known as "Disco Queen". She was known to her associates and clientele in New York as "Z" or "Betty" or "Angel". Petitioner was actively involved in a number of income-producing activities. She operated a prostitution business, in which she arranged for other women or herself to

engage in sexual activities with individuals who paid her for such services. The parties have referred to such arrangements as the provision of "escort" services, and we shall do so in this opinion. Petitioner also sold electronic equipment, lighting equipment, theater tickets, and music tapes. She earned money for designing apartment interiors and installing entertainment systems; she also engaged in obtaining loans; and she dabbled in her family's real estate activities in Hawaii and Ohio.

Petitioner formed Real Services, Inc. (Real Services), in New York State on September 29, 1988. Petitioner was its president and sole shareholder. She signed a preprinted document, filling in the blanks, which indicated that she was an employee of Real Services. Her associate and companion, Laura C., agreed to serve as vice president of Real Services but performed no meaningful activities in that role. Ms. C. was elected vice president of Real Services several months after using that title to attest to petitioner's employment contract.

Two individuals named Ted P. and Michael S. were business associates of petitioner but were not actively involved in the operation of the corporation. Real Services did not file Federal corporation income tax returns, Federal payroll tax returns, or New York State tax returns covering any of the years at issue.

Petitioner maintained sketchy and incomplete records for Real Services. She did, however, have signature authority over a

checking account at Chemical Bank in the name of Real Services. At the request of Chemical Bank, her lawyer obtained an employer identification number (EIN) for Real Services.

Petitioner gave the name "Real Services" for use on the sales slips she received when she purchased electronic equipment for resale. Instead of giving an identifying number for Real Services, however, petitioner used her own Social Security number when requesting exemptions from State sales tax for these purchases.

Petitioner made deposits into the Real Services' checking account totaling $46,242.81 in 1989 and $73,351.08 in 1990. In October 1989, petitioner wrote a check on this account for $500 to her brother and another for $250 to her sister as birthday presents. The next month petitioner wrote a check on this account for $900 to pay private school tuition for the daughter of her companion, Laura C., and another check to pay for Ms. C.'s contact lenses. In 1990, petitioner paid $100 for an exercise class with a check drawn on the same account. The account was closed in December 1990.

Petitioner also maintained two accounts at Chemical Bank in her own name. She deposited $2,500.00 and $2,452.61 into one such account in 1989 and 1990, respectively. Into the other personal account, she deposited $12,711.48 in 1989 and $12,373.85 in 1990.

During the years in issue, petitioner's principal residence was an apartment at 500 E. 77th Street in New York. She took over the lease of that apartment in the early 1980s from an individual named Joy C. but continued to use Ms. C.'s name on documents regarding that lease. She did not use her own name or that of Real Services. Petitioner shared the apartment with Laura C., who occasionally used Joy C.'s name instead of her own. After 1986, Laura C.'s infant daughter also lived in the E. 77th Street apartment.

In July 1989, petitioner arranged to take over an apartment, located at 320 E. 65th Street in New York, rented by another individual named Jane M. Ms. M. was allowed to live at the E. 77th Street apartment while the apartment on E. 65th Street was renovated. Ms. M.'s name remained on the lease for the E. 65th Street apartment; Real Services was not identified on the lease document.

## 2. Unreported Income

For petitioner's 1989 and 1990 taxable years, respondent determined unreported income in a number of categories. For convenience, we discuss the issues presented in each of these categories in the order they were presented in the deficiency notice.

A.  Escort Income

Petitioner arranged for the provision of escort services during 1989 and 1990 out of the two apartments noted above, as well as an apartment on W. 58th Street in New York during the latter year.  She received cash and checks in payment for those services.  At her request, many of the checks were drawn to the order of Real Services.

Dennis T. engaged escort services at least six times at petitioner's E. 77th Street apartment.  Mr. T. received escort services from Laura C.  In terms of his direct dealings with petitioner, however, he engaged only in legitimate business activities.  These included a loan to petitioner for $4,000, which she repaid with a mixture of checks from the Real Services' account and from her personal accounts.

A business associate of petitioner, Michael S., paid for escort services received at either petitioner's E. 77th or E. 65th Street apartment, approximately six times during 1989 through 1990.  However, the arrangements were made by, and the money was paid to, Laura C.

Paul G. paid petitioner $1,500 in 1989 and $500 in 1990 for arranging escort services for him with other women.  Mr. G. also provided investment advisory services for one of the women providing escort services to him pursuant to petitioner's

arrangement, but none of the amounts he paid petitioner constituted a fee for introducing him to that woman.

Over a 10-year period that included 1989 and 1990, Jeffrey F. paid between $5,000 and $15,000 to petitioner for procuring escort services for his business clients. He wrote a $200 check to cash in September 1989 that petitioner deposited into the Real Services' checking account. Mr. F. dealt with at least one other escort service in addition to petitioner's during this period. He paid $1,500 to petitioner for escort services in 1989 and $1,500 in 1990.

Alexander K. issued a check for $1,200 that was made out to Real Services and dated October 12, 1989. Petitioner deposited this check in the Real Services' checking account. Petitioner had in her possession Alexander K.'s business card.

Between 1989 and 1992, an individual named Richard S. availed himself of petitioner's escort services "maybe once a month but not necessarily for all that period of time." He paid $200 per visit. Petitioner received $2,700 in 1989 and $2,700 in 1990 from Mr. S. for escort services. Mr. S. abused alcohol during the period that he used petitioner's escort services.

Meyer S. wrote 10 checks to cash during the first half of 1990 as payment to petitioner for escort services she arranged. Petitioner deposited the checks into the Real Services' checking account. The 10 checks totaled $1,450. However, these 10 checks

included checks totaling $460 that were dishonored, as well as checks totaling $460 that were provided as replacements for the dishonored checks.

A check for $200, dated June 23, 1989, was made payable to cash by Eric K. and endorsed by Jane M. for Real Services. Jane M. was one of the women who provided escort services to customers pursuant to petitioner's arrangements. The check was deposited into the Real Services' account.

Ronald K. paid petitioner approximately $125 per session for escort services she arranged on 12 to 15 occasions during the years 1989 through 1990. Additionally, in 1990, he lent petitioner $5,000, which she repaid without interest. On two or three occasions, however, she provided him with the escort services of other women in appreciation for his having lent her the money.

In the summer of 1990, Michael L. lent petitioner $4,000 in the form of a check made out to Real Services. Two months later, petitioner issued him a check in repayment for $4,800. The check was dishonored, and petitioner then repaid Mr. L. by providing escort services.

Harvey K. paid petitioner for escort services provided by herself and by other women during 1990. He visited between three to four times and paid petitioner $180 per visit.

A check issued by Crihil I. for $1,300, made payable to Jennifer R. "and/or cash" and dated November 10, 1990, was endorsed by Jennifer R. to Real Services.  On November 15, 1990, petitioner deposited the check into one of her personal accounts at Chemical Bank.  Jennifer R. was one of the women who provided escort services to customers pursuant to petitioner's arrangements.

Near the end of 1989, petitioner deposited a check for $400, dated December 15, 1989, made payable to Real Services from Douglas B.  During 1990, petitioner deposited into her Chemical Bank accounts two checks to cash totaling $225 from Jerrold M., a check to cash for $200 from William C., and two checks payable to cash totaling $140 from Takero O.  These six checks were received by petitioner as payments for escort services.

In connection with providing the escort services, petitioner was required to pay the women who performed services for her clientele.

On November 10, 1990, petitioner endorsed and deposited into her account a check for $500 made payable to Real Services by Raj International.  This check constituted part of a loan to petitioner from Parvin S.  She repaid the loan later that year with checks drawn on Real Services' account and on her personal account.

B. Embezzlement Income

Michael S., who received escort services at petitioner's apartments during 1989 and 1990, also engaged in certain legitimate transactions with petitioner in 1989. Petitioner talked him into lending her $12,000 on October 10, 1989. She explained that the loan would finance the furnishing of the apartment on E. 65th Street. Mr. S. reviewed the expenses of furnishing the apartment and visited the apartment to verify that it had been furnished.

As security for the $12,000 loan, petitioner gave Mr. S. a letter promising him a share of a commission she would earn on the sale of some family property, known as Haiku Plantation, located in Hawaii. Mr. S. looked at some documents describing the property and discussed its value with petitioner's sister, who, he understood, had the majority ownership in the property. Petitioner partially repaid Mr. S. with a series of checks totaling $3,640 written during first half of 1990.

Mr. S. also purchased a large supply of magnetic tapes from petitioner for $10,000, which he then donated to a school. Mr. S. obtained these materials from petitioner because he could get a "better rate" than elsewhere. One of his checks given in payment to petitioner for this purchase, for $3,000, was returned unpaid.

Howard S. lived in the same apartment building as petitioner. He became friendly with petitioner and, in 1989, lent her $5,000. On August 1, 1989, she agreed to repay that amount within 60 days. By the first quarter of 1991, petitioner had repaid Mr. S. $1,300, which he acknowledged by initialing an invoice to that effect. Mr. S.'s loan was made to petitioner individually, but the repayment came in the form of Real Services checks. On August 12, 1991, Mr. S. sued petitioner in both her capacities; i.e., as "Zabetti Pappas, d/b/a/ Real Services * * *", with respect to the loan. He alleged, among other things, that he had lent petitioner $3,750 and that "to date no monies have been paid back".

John K. was a friend of petitioner's from their college days at Vassar. Mr. K. believed petitioner possessed business acumen and trusted her on the basis of their friendship. He sought petitioner out in 1990, seeking a profitable return on money he wished to invest. In March 1990, Mr. K. gave petitioner $10,000 to invest in real estate projects that she described. In August 1990, petitioner advised Mr. K. that she had an investment opportunity that would return a profit in 30 days. On the basis of this representation, he gave her an additional $5,000 to invest. She returned to him only $1,750, in the form of a check for $1,250, dated September 19, 1990, and the payment of $500 in cash. Petitioner's other checks to him were dishonored.

Petitioner offered various excuses to Mr. K. for her failure to return his money, either the $10,000 or the balance of the $5,000, which he did not believe.

Mr. K.'s investments with petitioner were made in the form of checks made out to Real Services, but when repayments fell short, petitioner wrote to him, "I can start paying even more next month * * *. I am really trying--its [sic] just that my finances are jumbled." Her letter made no mention of Real Services.

On or about July 24, 1990, petitioner received $5,000 from Jennifer R., one of the women who provided escort services to customers pursuant to petitioner's arrangements. Petitioner executed a letter memorandum to record the $5,000 payment, which stated that the money "shall be used for investment purposes" and provided for a "guaranteed minimum return" of 25 percent "interest" in 1 year, on July 24, 1991. On or about November 7, 1990, petitioner received an additional $10,000 from Jennifer R. under similar circumstances. Petitioner executed another letter memorandum, which recorded her receipt of $10,000 that was to be used "for investment purposes" and provided for a "guaranteed return" of 25-percent "interest", payable within 45 days, or by December 21, 1990. Jennifer R. died before the trial in this case.

C.  Electronics, Introduction Fees, Theater Tickets, and
Music Tape Income

During 1989, petitioner received $10,800 from the sale of electronics to, as well as the payment of introduction fees by, Ted and Brian P.  Petitioner also received $7,800 from the sale of electronics to Howard S. (in addition to the $5,000 loan from Mr. S. noted earlier).  Petitioner's cost of goods sold to Ted and Brian P. and to Howard S. in 1989 was $5,371.

In August 1989, petitioner received $300 in the form of a check written to her individually by David M. The check was for the purchase of tickets to the Broadway show "Phantom of the Opera".  Petitioner, as "Zabetti Pappas - REAL SERVICES", had paid $300 for these tickets.  She also received $250 for tickets to the Broadway show "M. Butterfly" for which she paid the same amount.

On September 18, 1989, Paul H. wrote a check to Real Services in the amount of $110, in payment for prerecorded music tapes that had cost petitioner $12.  Petitioner deposited this check into Real Services's checking account.

In 1990, petitioner received $3,000 for additional electronic equipment sold to Ted and Brian P.  This equipment included some security devices for a warehouse rented by Ted P. Petitioner's cost for the electronic equipment totaled $2,628. In the same year, Howard S. paid her $2,775 for additional electronic equipment.  The items petitioner sold him included a

52-inch rear-projection television and two answering machines. The rear-projection television cost her $2,902, including taxes and shipping, while the answering machines cost her $210.

During 1990, petitioner also received $1,400 in cash from Kenny T. for the sale of a video cassette recorder for $200 and a 40-inch rear-projection television for $1,200. She paid $1,400 for those items. The television was returned to the business from which petitioner purchased it for a credit of $1,200. She accordingly neither made nor lost money on the transactions with Kenny T.

D. Rental Income

Petitioner arranged a lease and sublease in her own name for the apartment on W. 58th Street. In 1990, petitioner received $2,800 from an individual named Terri D. representing 4 months' rent for that apartment.

3. Petitioner's Business Expenses

During 1989, petitioner incurred rental expenses of $7,763 and an electricity expense of $302 with respect to the apartment on E. 65th Street at which she conducted some of her escort business.

During 1989, petitioner lived in the apartment on E. 77th Street. She had a room in that apartment in which she conducted office business and in which escort services were occasionally provided.

During 1989, petitioner incurred additional business expenses of $825 for office expenses, printing expenses, and travel, plus $600 for business-related telephone service. She also incurred printing costs of $24 and miscellaneous costs paid to contractors of $132.

During 1989, petitioner also paid a total of $3,000 in legal and professional fees to the law firm of Saltzman & Holloran and to Prentice-Hall Financial Services relating to the incorporation of Real Services. She incurred additional legal expenses of $1,000 in defense of charges that she was using the apartment on E. 77th Street for an illegal purpose.

During 1989, petitioner, in the name of Real Services, executed a brokerage agreement in which she undertook to sell an estate in Hawaii. The sellers were petitioner's sister and another individual. Petitioner spent considerable sums in improving and marketing the property. The property had been recorded as belonging to their deceased father and another individual. The efforts to sell the property were unsuccessful, and it was foreclosed upon in 1991.

Petitioner incurred rental expenses of $3,600 and utility expenses of $223 in 1990 for the apartment on W. 58th Street which, in that year, was used in her escort business and was also subleased for 4 months.

Petitioner continued to rent the apartment on E. 65th Street for business purposes during 1990. She incurred rental expenses of $13,983 and a utility charge of $790 in that year with respect to that apartment.

During 1990, petitioner continued to live in the apartment on E. 77th Street.

Petitioner incurred $100 for messenger expenses in 1990 and $126.60 in shipping and mailing expenses. She incurred business expenses of $600 for telephone service in that year. She also paid monthly services charges totaling $220 during 1990 on the Real Services' checking account. In the same year she paid legal fees of $1,650 in defending against charges that she was using the apartment on E. 77th Street for an illegal purpose. She paid an additional $400 to an attorney in connection with obtaining a lease.

In 1990, petitioner also paid $150 to her brother for appraisal fees concerning some property inherited from their father.

4. Petitioner's Interest Expenses

Petitioner frequently borrowed money. In addition to the instances already cited, Tammy M., one of the women who provided escort services to customers pursuant to petitioner's arrangements, lent petitioner $6,000 in 1990. Petitioner wrote checks in repayment totaling at least $6,070. Many of

petitioner's repayment checks bounced, however, or were reinvested, on the basis of petitioner's representation that she would invest this money in real estate on behalf of Tammy M. Tammy M. recovered the amount of her loan to petitioner, but she received no more than that.

In another transaction in early 1990, petitioner received $2,500 from Vania W. Petitioner executed a letter memorandum dated February 3, 1990, acknowledging her receipt of $2,500 from Vania W., which she promised to invest and to repay in 30 days with $1,000 interest. Petitioner subsequently wrote two checks in March 1990 totaling $2,650 on a Real Services' account, made payable to herself or to cash. Although the memorandum line on the checks indicated that they were executed as a "return" or "replacement" for Ms. W., each check was endorsed only by petitioner herself.

In the summer of 1990, petitioner borrowed $2,500 from a tennis-playing partner named Phillip B.; he charged her no interest on the loan. She made substantial repayments a few months later.

## 5. Petitioner's 1991 and 1992 Taxable Years

For the last two years in issue, 1991 and 1992, respondent determined petitioner's unreported income by applying cost-of-living survey information published by the Bureau of Labor Statistics (BLS). Respondent used BLS tables that classify the

cost of living for specific years according to such factors as age, size of consumer unit, occupation and location in the greater New York area to determine that petitioner had a cost of living--and, hence, net income--of $16,766 for 1991 and $17,461 for 1992.

OPINION

The Commissioner's determinations in the notice of deficiency are presumed correct, and petitioner bears the burden of proving that the determinations are in error.[3]  See Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).

We note at the outset that petitioner has no credibility with respect to the matters on which she testified.  Her testimony was shown on repeated occasions to be false, indicating to us that she did not consider herself under any particular obligation to testify truthfully in these proceedings.  For example, she denied absolutely that she, either in a personal or corporate capacity, received any money for providing escort services, although many of the 17 individuals identified in respondent's notice of deficiency testified credibly that they paid her for such services.  Also, petitioner first denied any detailed knowledge regarding an eviction proceeding for an

---

[3] Sec. 7491 does not apply to this case because the examination commenced prior to July 22, 1998, the effective date of that section.  See Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(c)(1), 112 Stat. 726.

apartment she had rented, and then revealed a familiarity with minute details regarding the proceeding when cross-examining witnesses. In addition, on at least one occasion petitioner sought to have a document admitted into evidence that she had falsified. A witness testified credibly that petitioner provided him with a written statement that contained a material misstatement. He corrected the document and then signed it. Petitioner then substituted a page of that document which failed to reflect his correction before she submitted the document to this Court. We accordingly give credence to petitioner's testimony and proffered documentary evidence only where we are convinced by independent corroborating evidence of their veracity or authenticity.

I. Whether Amounts Paid to or Received by Real Services Are Properly Treated as Petitioner's Taxable Income

The first issue to be addressed concerns the identity of the taxpayer. Petitioner contends that she, individually, is not liable for the taxes at issue; instead, she argues, the corporation Real Services is liable for any taxes that may be owing, because Real Services received the unreported income that respondent has attributed to petitioner in his determination.

Taxpayers have the right to shape business transactions in a manner that minimizes the incidence of taxation. Gregory v. Helvering, 293 U.S. 465, 469 (1935). In this regard, a corporate entity is deemed to exist as a separate taxpayer if it is

organized to carry on a business activity or if, in fact, it has carried on such activity. Moline Props., Inc. v. Commissioner, 319 U.S. 436 (1943). However, "in matters relating to the revenue, the corporate form may be disregarded where it is a sham or unreal. In such situations, the form is a bald and mischievous fiction." Id. at 439. In the latter situation, the Government may not be required to acquiesce in the taxpayer's election of that form for doing business which is most advantageous to him. The Government may look at actualities and upon determination that the form employed for doing business or carrying out the challenged tax event is unreal or a sham may sustain or disregard the effect of the fiction as best serves the purposes of the tax statute. See Higgins v. Smith, 308 U.S. 473, 477 (1940).

Here, if Real Services operated merely as a sham or the alter ego of petitioner, its incorporation would have no impact on her Federal income tax liabilities. See G.M. Leasing Corp. v. United States, 429 U.S. 338, 350-351 (1977). The question before us, then, is whether Real Services "conducted the kind and amount of business activities to be a taxable entity." Kimbrell v. Commissioner, 371 F.2d 897, 902 (5th Cir. 1967), affg. T.C. Memo. 1965-115.

In this case, "Adopting a reasonable meaning of the Moline Properties' guiding phrase," id., we hold that Real Services did

not conduct sufficient business activities to be recognized for Federal income tax purposes.

Petitioner's activities with respect to Real Services reveal many characteristics of an alter ego, such as:

> "the intermingling of corporate and personal funds, undercapitalization of the corporation, failure to observe corporate formalities such as the maintenance of separate books and records, failure to pay dividends, insolvency at the time of a transaction, siphoning off of funds by the dominant shareholder, and the inactivity of other officers and directors." [LiButti v. United States, 107 F.3d 110, 119 (2d Cir. 1997) (quoting Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 18 (2d Cir. 1996)).]

Petitioner observed no meaningful distinction between her personal funds and those of her corporation.  Although petitioner opened bank accounts in the name of Real Services, she siphoned funds from that account for personal expenses and gifts.  On the other hand, petitioner wrote checks in her own name for transactions that she now alleges were those of Real Services. The record also reveals a number of checks made out to Real Services from petitioner's escort service clients, but the evidence suggests that, in naming the payee, the clientele were only following petitioner's wishes.

There is no indication that Real Services was ever properly capitalized; to the contrary, it often appeared to be insolvent. Individuals such as John K. and Tammy M., who had made loans to petitioner operating as Real Services, reported that checks they received in repayment often were dishonored.

Petitioner consistently ignored corporate formalities. After the organizational meeting for Real Services, there is no indication of another meeting of a board of directors. Real Services maintained no office separate from petitioner's personal address, and petitioner was its only purported employee. There is no evidence that Real Services furnished to outside parties any papers relating to petitioner's employment, such as tax withholding forms or other payroll records. There are no meaningful corporate records; petitioner produced only three handwritten documents as records of the corporation--one indicating the costs of furnishing the E. 65th Street apartment and the other two listing startup costs. Even petitioner's employment contract is suspect; it is a fill-in-the-blanks form that contains many blanks and was executed several months before the date that the hiring officer, petitioner's companion Laura C., allegedly assumed office. We reject petitioner's contention that other corporate records were stolen; we find it much more likely that such records never existed. There is no history of the declaration or payment of dividends.

No other individuals were active as officers or directors of Real Services. Petitioner exaggerated the roles played by two individuals named Ted P. and Michael S. in the operation of the corporation. Petitioner, in fact, altered a document in which Mr. P.'s son Brian had indicated to her that his father was not

an officer of Real Services.  Moreover, Mr. S. testified that he was not involved in the directorship or management of Real Services.  Although Laura C. provided some testimonial support to petitioner's claims of corporate meetings and elections, we believe that her testimony was coached and does not accurately represent actual events.

There is no evidence of any business extending credit to Real Services; for example, its name did not appear on any of the documents used for its alleged leasing of real properties.  Indeed, the contrary appears to be true:  on the E. 65th Street apartment, the name of the lessee was Jane M., not Real Services, and on the E. 77th Street apartment, the name was that of Joy C., not Real Services.  Similarly, the lease for the W. 58th Street apartment does not indicate that the lessor-sublessee was Real Services.

Real Services' alleged dealings in the Hawaii real property are similarly suspect.  These arrangements were made with petitioner's family members.  Once again, many of the documents executed in these transactions bear only petitioner's name, and not that of Real Services.

In sum, there is no evidence that Real Services engaged in business as a separate entity.  Petitioner cites clauses typically used in preprinted forms for incorporating business entities.  The use of such clauses for Real Services, however,

falls short of showing actual business activity by the corporation. Nor is such activity reflected in petitioner's practice of having salespeople and customers use the name "Real Services" when they executed sales slips and checks to petitioner. The fact remains that no one who dealt with petitioner did so with any reliance upon the business probity or solvency of Real Services. To the extent that anyone acquiesced in petitioner's employment of the name "Real Services", they did so with the understanding that they were doing business with her, and not with a corporation.[4]

We conclude that Real Services functioned merely as an alter ego of petitioner and is therefore a sham corporation. As a result, we disregard the existence of Real Services for purposes of Federal taxation; the income at issue is properly taxed to petitioner individually.

## II. Whether Petitioner Had Unreported Income From an Escort Business in 1989 and 1990

Petitioner operated an escort business as previously described during 1989 and 1990. Although she denies involvement with the escort business, and with the receipt of income from

---

[4] In this regard, petitioner argues that the dealings of Real Services involved making payments to a puppeteer. In support she cites an exhibit that was not introduced into evidence. She has made similar citations throughout her briefs. These documents are not part of the record and have not been considered in making our decision herein. Rule 143; see Eickmeyer v. Commissioner, 66 T.C. 109, 110 n.3 (1976).

that business, the evidence to the contrary provided by her clientele is overwhelming. That evidence nonetheless falls short of providing us with a firm basis upon which to calculate her income from those activities. Perhaps unsurprisingly, few of the witnesses have been entirely forthcoming, leaving us with an unsatisfactory record.

Respondent has used the specific item method of reconstructing petitioner's income for 1989 and 1990. This method depends upon proof of specific items of income that were omitted from the taxpayer's return. In Estate of Beck v. Commissioner, 56 T.C. 297, 353 (1971), the Court stated: "the 'specific item' method of proof * * * simply consists of evidence of particular or specific amounts of taxable income received by the taxpayer during a particular tax period, with evidence that the taxpayer did not include such amounts in his tax return". See also United States v. Merrick, 464 F.2d 1087, 1092 (10th Cir. 1972). In most instances, petitioner has presented evidence disputing the specific amounts or taxability of the items in question. We have used our best judgment on the basis of the record before us to arrive at the amounts of income involved.

Respondent determined that petitioner had unreported escort income of $3,600 in 1989 and $3,600 in 1990 from an individual named Dennis T. Dennis T. testified, however, that he had only legitimate business dealings with petitioner. He conceded that

he engaged escort services at least six times at petitioner's E. 77th Street apartment. The services were provided by women other than petitioner. Dennis T. recalled the name used by petitioner's companion Laura C. and conceded receiving escort services from her. There are no checks or other documentary evidence connecting petitioner to any amounts Dennis T. may have paid for escort services received at the E. 77th Street apartment, where Ms. C. also resided. Although the evidence demonstrates a business relationship between petitioner and Dennis T., it fails to connect her with any of the money he paid for escort services. We accordingly do not sustain the determination.

Respondent determined that petitioner had unreported escort income of $945 in 1989 and $945 in 1990 from an individual named Michael S. Although Michael S. was a business associate of petitioner's and admitted paying for escort services at one of petitioner's apartments, the arrangements were made by, and the money was paid to, Laura C., not to petitioner. The payments for escort services by Michael S. have not been connected to petitioner, and we accordingly do not sustain the determination.

Respondent determined that petitioner had unreported escort income of $1,500 in 1989 and $750 in 1990 from an individual named Paul G. Mr. G. testified that he paid between $1,500 and $2,000 to petitioner for escort services during the period of

their relationship, which he estimated to be approximately 2 years. His testimony and the documentary evidence support the conclusion that he paid most of this amount in 1989, but that the relationship continued into 1990. On the basis of his testimony, we find that petitioner received $1,500 from Mr. G. in 1989 and another $500 in 1990. We accordingly sustain all of respondent's determination except to the extent of $250 in 1990.

Respondent determined that petitioner had unreported escort income of $10,500 in 1989 and $3,900 in 1990 from an individual named Jeffrey F. The evidence adduced in connection with this determination conflicts to some extent with the specific items of income determined by respondent. Mr. F. recognized the name Real Services as the payee of checks he used to acquire escort services for his clients. The record contains one check from him for $200 that petitioner deposited. Mr. F. also testified that he paid between $5,000 and $15,000 to a woman named "Angel", one of petitioner's nicknames, for escort services for his clients. However, Mr. F. testified that these payments took place over a 10-year period during which he also used at least one other escort service for his clients. Mr. F. was unable to identify petitioner at trial, or to recall the amount he paid petitioner during the years at issue. We conclude that the evidence establishes that Mr. F. paid petitioner $1,500 in 1989 and $1,500

in 1990.  We accordingly sustain respondent's determination to that extent.

Respondent determined that petitioner had unreported escort income of $1,400 in 1989 and $200 in 1990 from an individual named Alexander K.  The evidence with respect to these specific items consists of Mr. K.'s check for $1,200 made out to Real Services, dated October 12, 1989, which petitioner deposited into the Real Services' account; petitioner's possession of Mr. K.'s business card; Mr. K.'s testimony that he did not purchase escort services from petitioner in 1989 or 1990, but that he entered only the amount on the check and signed it; and petitioner's claim that the check was in payment for space for an office party.  Petitioner's claim is uncorroborated; the amount is improbable for the use of residential apartment space for a party; and she is otherwise not credible.  Given the other proof of petitioner's extensive dealings in providing escort services in 1989, we find that the $1,200 payment in October 1989 was for escort services.  There is no other evidence that petitioner had the specific items of income determined by respondent or which connects petitioner to any payments from Mr. K. for any goods or services.  We accordingly sustain respondent's determination only to the extent that petitioner had unreported escort income of $1,200 in 1989.

Respondent determined that petitioner had unreported escort income of $2,700 in 1989 and $2,700 in 1990 from an individual named Richard S.  Mr. S. testified that, between 1989 and 1992, he utilized petitioner's services "maybe once a month but not necessarily for all that period of time" and paid $200 per visit. Petitioner has failed to provide sufficient credible evidence that Mr. S. paid her less than the amounts determined for the years in issue.  We accordingly sustain respondent's determination.

Respondent determined that petitioner had unreported escort income of $2,350 in 1990 from an individual named Meyer S.  Mr. S. wrote 10 checks to cash during the first half of 1990 for escort services arranged by petitioner.[5]  Petitioner deposited the checks into the Real Services' account.  The 10 checks totaled $1,450.  The $1,450 in Meyer S.'s checks in the record included $460 in checks that were dishonored, as well as $460 in checks that replaced the dishonored checks.  Thus, the documented amount that Mr. S. paid petitioner for escort services in 1990 is $990 ($1,450 less $460).  We therefore hold that petitioner received $990 as payment for the escort services she arranged for

---

[5] Although Mr. S. testified that the checks were payment for the use of petitioner's apartment to work on clothing designs, his testimony was highly implausible in the circumstances and not worthy of belief.  We find that Mr. S. testified falsely in view of an obvious motive to avoid admitting to the purchase of escort services.

Mr. S. in 1990, and sustain respondent's determination only to that extent.

Respondent determined that petitioner had unreported escort income of $200 in 1989 from an individual named Eric K. A check in the amount of $200, dated June 23, 1989, was made payable to cash, written by Eric K., and endorsed by Jane M., who provided escort services to customers pursuant to petitioner's arrangements. In these circumstances, and because the check was deposited into the Real Services' account controlled by petitioner, we sustain respondent's determination.

Respondent determined that petitioner had unreported escort income of $875 in 1989 and $875 in 1990 from Ronald K. Respondent's figures reflect seven escort sessions per year at $125 per session. Mr. K. testified on cross-examination, consistently with respondent's determination, that he received escort services arranged by petitioner on 12 to 15 occasions during the 2-year period 1989 through 1990. He also testified that he paid approximately $125 per occasion. Petitioner's contention that she paid $875 of this amount in 1990 to furnish mud wrestlers at an event sponsored by Mr. K. was contradicted by him, and we do not accept it. Accordingly, we sustain respondent's determination.

Respondent determined that petitioner had unreported escort income of $6,000 in 1989 and $6,000 in 1990 from an individual

named Michael L.  Mr. L. testified to paying substantial sums for escort services in 1989 and 1990 that were provided in petitioner's E. 77th Street apartment.  He could not, however, identify petitioner in person, and he was uncertain whether a person he knew as "Angel" was the person depicted in a photograph of petitioner taken close to the years in issue.  He described the "Angel" with whom he had dealings as a person who bears little resemblance to petitioner.  The record before us fails to provide an adequate basis for finding that petitioner, rather than some of her associates, received unreported income in the form of direct payment for escort services from Mr. L. during the years at issue.  The evidence nevertheless supports a finding that petitioner received $4,000 in escort income from Mr. L., and that she received this amount in 1990.  In the summer of 1990, Mr. L. lent $4,000 to "Real Services Corp."  Two months later, petitioner signed and issued a check, presumably in repayment, for $4,800.  The check was dishonored, and Mr. L. acknowledged that his loan was "most probably" repaid in the form of escort services.  Although Mr. L. did not pay petitioner directly for escort services, petitioner's signature on the invalid check nevertheless connects her to the receipt of $4,000 in 1990 in exchange for which Mr. L. received such services.  We accordingly sustain respondent's determination only to the extent of $4,000 of unreported escort income in 1990.

Respondent determined that petitioner had unreported escort income of $540 in 1990 from an individual named Harvey K. Mr. K.'s testimony supports the determination in full, in that he recalled paying petitioner for escort services on three or four occasions in 1990, estimated the cost at between $100 and $200, and acknowledged a check paid in one instance in 1990 for $180. Respondent's determination of $540 is three times this figure. We do not accept petitioner's contention that she and Mr. K. were having an affair and that any escort-related activities involved were independent of his giving her money. We accordingly sustain respondent's determination.

Respondent determined that petitioner had unreported escort income of $1,300 in 1990 from an individual named Crihil I. A check for $1,300 issued by Mr. I. on November 10, 1990 to Jennifer R. and/or cash was endorsed by Jennifer R. to Real Services and deposited by petitioner into one of her personal bank accounts on November 15, 1990. Mr. I. did not testify and Ms. R. is deceased.

Jennifer R. was one of the women who provided escort services to customers pursuant to petitioner's arrangements during the years in issue. In these circumstances, and in light of the other proof that petitioner was regularly engaged in the provision of escort services in 1990, we conclude that this check was for escort services arranged by petitioner. We reject

petitioner's contention that this $1,300 was a loan to her (or Real Services) from Jennifer R. On the basis of the record in this case as a whole, we do not believe that all of this money belonged to Jennifer R. so that she could "lend" it to petitioner. The credible testimony of other witnesses establishes that single payments of this magnitude were sometimes made for escort services arranged by petitioner when the occasion was a "party" involving several customers. We infer that this $1,300 payment was for escort services in addition to those provided by Jennifer R. personally. In addition, the record as a whole also establishes that when petitioner arranged for other women to provide escort services, she did not do so for free. Therefore, we believe that the check signed over to petitioner by Jennifer R. included petitioner's "brokerage" fee for the transaction she had arranged. In sum, we are satisfied that the evidence supports, and petitioner has demonstrated no error in, respondent's determination. We accordingly sustain it.

Respondent determined that petitioner had unreported escort income of $1,200 in 1989 and $1,200 in 1990 from an individual named Douglas B.; $1,440 in 1989 and $1,680 in 1990 from an individual named Jerrold M.; $1,050 in 1989 and $1,050 in 1990 from an individual named William C.; and $400 in 1989 and $600 in 1990 from an individual named Takero O.

In 1989, petitioner deposited a check payable to Real Services from Douglas B. for $400. During 1990, petitioner deposited into her Chemical Bank accounts two checks to cash totaling $225 from Jerrold M., a check to cash for $200 from William C., and two checks payable to cash totaling $140 from Takero O. Petitioner claims that the $400 check from Douglas B. represents repayment of a loan. She argues that she got two checks from Jerrold M. for helping him to find his girlfriend. She claims not to know William C. and that she got his $200 check from a third party for room rental. She says the two checks totaling $140 from Takero O., plus $10 cash, were payment for tickets to a Broadway show. We do not accept her self-serving testimony. See Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). To the contrary, in light of the other substantial evidence that petitioner was in the business of providing escort services for compensation during 1989 and 1990, her deposit of checks made out to Real Services or to cash from Douglas B., Jerrold M., William C., and Takero O. is sufficient, we conclude, to support the finding that these six checks were payments to her for the provision of escort services. On the other hand, these individuals did not testify, and there is no evidence in the record that petitioner had any specific items of income from these individuals beyond the amounts evidenced by the checks. We accordingly hold that petitioner had unreported escort income in

1989 of $400 from Douglas B.; and in 1990 of $225 from Jerrold M., $200 from William C., and $140 from Takero O., but we do not otherwise sustain respondent's determinations with respect to these individuals.

Respondent determined that petitioner had unreported escort income of $500 from Raj International in 1990. Although petitioner endorsed and deposited into her account a $500 check in November 1990 made payable to Real Services by Raj International, we have found that this amount was a loan to petitioner which she repaid later that year with funds drawn on Real Services' and her personal accounts. Accordingly, respondent's determination with respect to Raj International is not sustained.

III.  Whether Petitioner Had Unreported Income From Fraudulent Loan and Investment Transactions

Respondent determined that petitioner received embezzlement income in several instances during 1989 and 1990 by taking money, as "investments" or "loans", from friends and associates without any intention of repayment. See, e.g., James v. United States, 366 U.S. 213, 219 (1961) ("wrongful appropriations" constitute income if acquired with no intent to repay); United States v. Rochelle, 384 F.2d 748, 751-752 (5th Cir. 1967) (fraudulent loans are "wrongful appropriations" within the meaning of James v. United States, supra). We consider each determination separately.

Respondent determined that petitioner received embezzlement income of $18,500 from Michael S. in 1989. In pretrial pleadings, respondent asserted that the $18,500 determination consisted of: (i) $12,000 from petitioner's sale to Michael S. of a fictitious interest in certain real property in Hawaii; and (ii) $10,000 from a fraudulent loan transaction involving Michael S., of which petitioner had repaid $3,500.

Respondent now concedes that the $12,000 fictitious sale of property was in fact a loan of $12,000 by Mr. S. to petitioner, secured by an interest in any commission that petitioner might receive on the sale of the Hawaii property.[6] The evidence adduced at trial establishes that petitioner partially repaid this loan in a series of checks totaling $3,640 that were given to Mr. S. during the first half of 1990.

On brief, respondent argues that the $12,000 loan was income to petitioner in 1989, the year of its receipt, because she did not intend to repay this amount to Michael S. Petitioner, however, repaid $3,640 of the loan in 1990. We conclude that this repayment evidences an intent to repay at the time she obtained the loan, and that this intent continued at least through some portion of 1990. Although respondent has modified his theory to some extent in response to the evidence at trial,

---

[6] Respondent seeks findings of fact to that effect in his posttrial brief.

he has not asserted in the alternative that petitioner received income in 1990 as a result of this loan transaction. On this record, we are persuaded that petitioner has shown error in respondent's determination that she had $12,000 in income in 1989 as a result of the payment from Michael S. in that amount. Accordingly, the determination is not sustained.

With respect to the second element of respondent's original $18,500 determination, namely, the $10,000 fraudulent loan transaction, petitioner claims that this amount represents the proceeds from a sale of magnetic tapes from which she realized no gain. At trial, Mr. S. corroborated petitioner's claim by testifying that he paid her $10,000 for magnetic tapes which he then donated to a school.

On brief, respondent now argues that the $10,000, even if paid for tapes provided by petitioner, was nevertheless income to petitioner. Respondent's propounding of the theory that the $10,000 from Mr. S. was sales income, and not income from a fraudulent loan transaction, is, at a minimum, "new matter" within the meaning of Rule 142(a). Respondent's adoption of this theory (without making an allowance for cost of goods sold) is a new theory which, if we considered it, would prejudice petitioner. Its tardy assertion would deprive petitioner of an adequate opportunity to acquire the requisite evidence of her cost of goods sold. See Sundstrand Corp. v. Commissioner, 96

T.C. 226, 347 (1991).  Moreover, under Rule 142(a), respondent would bear the burden of proof as to the issue whether the $10,000 is sales income.  Even if we permitted respondent to raise this new theory, he would not prevail upon it because he cannot carry his burden.  The record shows that Mr. S. ordered tapes from petitioner because he could get a "better rate" than elsewhere.  He wrote her checks totaling $10,000.  One of those checks, for $3,000, was returned unpaid.  We believe that, if petitioner provided a better rate than other sellers, her loss of $3,000 on the sale likely prevented her from earning any profit on the transactions.  In any event, respondent has not shown otherwise.  We accordingly do not sustain any portion of respondent's determination that petitioner had $18,500 in unreported income from Mr. S. in 1989.

Respondent determined that petitioner had unreported income of $5,000 in 1989 from a loan transaction with an individual named Howard S.  On brief, respondent argues that this was a "fraudulent" loan transaction in that petitioner had no intention of repaying, making the original loan amount income to her in 1989.

We have found that Howard S. lent petitioner $5,000 in 1989 and that by the first quarter of 1991 she had repaid him $1,300.  Mr. S. acknowledged as much in early 1991 in an invoice that he admits initialing.  He subsequently sued petitioner in August

1991 with respect to the loan, seeking $3,750, which further confirms that significant repayment had been made.[7] Respondent makes no effort on brief to explain how petitioner lacked intent to repay this loan when she in fact repaid approximately 25 percent. His determination is not sustained.

Respondent determined that petitioner had unreported embezzlement income of $5,000 in 1989 from an individual named Jane M. Although the evidence establishes that Jane M. was an associate of petitioner's, petitioner has denied receiving this amount from Jane M. Respondent has not introduced evidence to rebut this assertion, nor has he contested petitioner's denial on brief. We conclude that respondent has abandoned this issue, see Julicher v. Commissioner, T.C. Memo. 2002-55; Zidar v. Commissioner, T.C. Memo. 2001-200 (citing Bradley v. Commissioner, 100 T.C. 367, 370 (1993)), and the determination is accordingly not sustained.

Respondent determined that petitioner had unreported embezzlement income of $13,250 from an individual named John K. Respondent clarified in his answer that the determination was

---

[7] Mr. S. subsequently made at least two statements to the IRS in connection with these proceedings that were inconsistent with these findings (and with each other), to the general effect that none of the $5,000 had been repaid. We are convinced, however, that Mr. S. would not have sued in 1991 for less than he thought he was owed. Further, when confronted at trial with the invoice documenting partial repayment, Mr. S. acknowledged his initials on the document.

based upon petitioner's having received $15,000 from John K. in 1990 to invest on his behalf and having only repaid him $1,750.

John K. was a college friend of petitioner's. Mr. K. testified credibly that he turned over $10,000 to petitioner in March 1990, based upon petitioner's representation that she could earn him a 25 percent return in 1 year. He believed that petitioner was a savvy businesswoman and trusted her on the basis of their friendship; he accordingly did not investigate her claims or plans with any rigor, although he recalled that she represented that the money would be invested in a real estate project in the Midwest. Several months later, in August 1990, petitioner advised Mr. K. that she had an investment opportunity that would give him a profit in 30 days. Mr. K. gave petitioner an additional $5,000 on her representation of a 30-day turnaround for that investment. According to his testimony, when the $5,000 was not returned as promised, Mr. K. first suspected that petitioner had taken advantage of their friendship and "hoodwinked" him; he became convinced of that fact when neither the $10,000 nor $5,000 was returned, and petitioner made excuses that he did not believe.

Petitioner contends that these amounts are not income to her because she genuinely tried and intended to repay Mr. K. These amounts were not bona fide loans, however; the money was given on the representation that it would be invested on Mr. K.'s behalf.

Petitioner's explanations of how the money was invested are vague, uncorroborated, and/or contradicted by Mr. K.'s credible testimony. On the basis of the evidence in the record, we are convinced that petitioner exploited Mr. K.'s trust in her to obtain the funds in issue, and then did not invest them as she had represented. As a result, she exercised sufficient dominion and control over the $13,250 she did not repay to render that amount taxable to her in 1990. See James v. United States, 366 U.S. at 219 (proceeds over which taxpayer wrongly assumes "actual command" taxable to him); United States v. Rochelle, 384 F.2d 748 (5th Cir. 1967); O'Sheeran v. Commissioner, T.C. Memo. 1983-702; see also United States v. Rosenthal, 454 F.2d 1252, 1254 (2d Cir. 1972). We accordingly sustain respondent's determination.

Respondent determined that petitioner had unreported embezzlement income of $15,000 in 1990 from an individual named Jennifer R. Respondent now asserts that petitioner had $17,700 of such income in that year.

Jennifer R. was one of the women who provided escort services to customers pursuant to petitioner's arrangements. Ms. R. died before trial, and the evidence that has been offered with respect to this item consists of the notes of one of respondent's agents concerning an interview he conducted with Ms. R. before her death, two letter memoranda documenting payments from Ms. R. to petitioner, and petitioner's testimony.

We turn first to the interview notes.  Although respondent's original determination in the deficiency notice was that petitioner had 1990 embezzlement income from Ms. R. of $15,000, respondent now contends on brief that the amount is $20,000, less a repayment of $2,300, or $17,700.[8]  Respondent bases his assertion of an increased amount and the partial repayment on the agent's notes.  We pass over the question whether the increased deficiency respondent asserts has been properly raised in this case, because we agree with petitioner that the agent's notes, which are the only basis for asserting the increased deficiency, are inadmissible hearsay.

Respondent argues that the notes qualify for the exception to the hearsay rule provided in Federal Rules of Evidence 804(b)(3).  Respondent maintains that the notes embody a statement against Ms. R.'s penal interest, because they reflect Ms. R.'s statement that she earned money as a prostitute. Respondent, however, does not seek the admission of the notes as proof of Ms. R.'s illegal profession; respondent seeks their admission to prove petitioner's receipt of a net $17,700 in embezzlement income from her.  It is settled that a statement against interest will not operate as an exception to the hearsay

---

[8] Although respondent on brief repeatedly states the balance of $20,000 less $2,300 as $17,800, we deem respondent to have taken the position that petitioner had unreported embezzlement income from Jennifer R. of $17,700.

rule when the statement sought to be introduced is only collateral to the statement against the declarant's interest. <u>Williamson v. United States</u>, 512 U.S. 594, 599-600 (1994). Such is the case with the statement respondent seeks to introduce. We accordingly decline to consider respondent's allegation that petitioner had embezzlement income in an increased amount of $17,700 from Ms. R. The sole basis for the allegation is inadmissible hearsay.[9]

With respect to respondent's original determination that petitioner had embezzlement income of $15,000 from Ms. R. in 1990, the two letter memoranda executed by petitioner establish to our satisfaction that petitioner received $5,000 and $10,000 from Jennifer R. in July and November 1990, respectively. In these memoranda, petitioner acknowledges receipt of the foregoing amounts, promises to invest the money, and guarantees a "minimum return" or "return" of 25 percent in 1 year (in one instance) or 45 days (in the other). We are struck by the similarity of these arrangements with those that petitioner foisted upon John K. That is, in the same year, with respect to both John K. and Jennifer R., petitioner first obtained a substantial sum

---

[9] Respondent also concedes on brief that the revenue agent's notes provide the sole basis for his determination that petitioner had unreported income of $2,600 in 1990 from the sale of electronics to Jennifer R. Because the notes are likewise inadmissible hearsay with respect to this transaction, there is no competent evidence that petitioner had this specific item of income, and we accordingly do not sustain the determination.

promising to return it in 1 year with a guaranteed return, and then went back to each individual several months later and persuaded him or her to part with another substantial sum by promising a quick return in 30 or 45 days. We draw the inference that petitioner engineered a scheme with Jennifer R. that was similar to the scheme to which John K. testified.

Unlike the situation with John K., Jennifer R. was deceased at the time of trial and unable to give testimony from which we might determine whether her payments to petitioner were loans or entrustments of funds to invest. Regardless of which characterization is more accurate, we are satisfied that petitioner is taxable on the amounts Ms. R. turned over to her in 1990. We decline to accept petitioner's self-serving testimony regarding her dealings with Ms. R. Absent petitioner's testimony, there is no evidence that petitioner repaid the amounts at issue when due or ever,[10] and Ms. R. is now deceased.

---

[10] To support her claim that she made repayment to Jennifer R., petitioner offered into evidence two deposit slips dated in January 1991 evidencing deposits totaling $2,771 into an account in the name of Jennson Co. The exhibits were not admitted because their relevance to Jennifer R. was not established. As part of her posttrial brief, petitioner submitted a copy of a business certificate indicating that Jennifer R. was conducting business under the name Jennson Co. Even if the foregoing exhibits were admitted, however, they would not establish repayment because there is no proof that petitioner made the deposits or, even if petitioner made them, that the deposits represented repayments with respect to the $15,000 in issue--as opposed to, e.g., payments to Jennifer R. for rendering escort services pursuant to petitioner's arrangements.

There is likewise no evidence that the funds were invested as petitioner represented to Ms. R. in the letter memoranda. Based on the record as a whole, we are satisfied that petitioner has failed to demonstrate error in respondent's determination that she had $15,000 in unreported income in 1990 as a result of payments to her from Jennifer R. in that amount; we accordingly sustain the determination. See James v. United States, 366 U.S. 213 (1961); United States v. Rosenthal, 454 F.2d 1252 (2d Cir. 1972); United States v. Rochelle, 384 F.2d 748 (5th Cir. 1967).

IV. Whether Petitioner Had Unreported Income From Sales and Rentals During 1989 and 1990

Respondent determined, also using the specific item method, that petitioner had unreported income from certain sales and rental activity during 1989 and 1990.

A. 1989 Sales of Electronics, Theater Tickets, and Music Tapes

Respondent determined that petitioner had unreported income from the sale of electronics of $10,500 from individuals named Brian and Ted P. and $8,200 from an individual named Howard S. Petitioner does not dispute receipt of these amounts,[11] except for $400 of the $8,200 received from Howard S. We agree with

---

[11] Although respondent originally determined that petitioner had unreported income in 1989 of $10,500 from electronics sales to Brian P., the parties subsequently stipulated that the amount received from Brian (and Ted) P. from the sale of electronics and certain introductory fees was $10,800 in 1989.

petitioner regarding this $400 and do not sustain that portion of respondent's determination.[12]

Respondent conceded at trial that petitioner is entitled to a cost-of-goods-sold allowance with respect to the foregoing sales of $1,360.[13] We conclude that petitioner has produced documentary evidence and testimony which establish that she may increase her cost-of-goods-sold allowance by an additional $4,011, for a total of $5,371, with respect to goods sold to those individuals.

The difference between the $18,300 petitioner demonstrably received from the P.'s and from Mr. S. in exchange for electronics merchandise provided to them and the $5,371 we have concluded petitioner paid for those goods is surprisingly large and reflects substantial unreported income. In making our allowance for the cost of goods sold to the P.'s and to Mr. S., we have resolved doubts in favor of petitioner, even to the

---

[12] Petitioner objected to respondent's "specific item" evidence for $400 of the amount received from Howard S. because the check documenting this amount states clearly that it is for a "ticket purchase", whereas respondent's determination, answer, and pretrial memorandum all took the position that the foregoing amount was for electronics. We advised respondent's counsel prior to trial that if the $400 check was intended to prove receipt of income by petitioner from the sale of tickets, respondent would be required to amend his pleadings. Respondent sought no leave to amend, and we accordingly treat the $400 specific item of income from Howard S. as abandoned.

[13] Although respondent contends on brief that the total conceded is $890, he clearly conceded an additional $470 at trial with respect to Howard S., for a total of $1,360.

extent of accepting her reasonably based estimated cost of a speaker system and a receiver.  She has claimed no larger costs than we have found, and, in any event, the record does not support our allowing her more.  Although we suspect that the actual cost of goods sold was higher, we cannot make that estimate absent a demonstration "that <u>at least</u> the amount allowed in the estimate was in fact spent or incurred for the stated purpose.  Until the trier [of fact] has that assurance from the record, relief to the taxpayer would be unguided largesse." <u>Williams v. United States</u>, 245 F.2d 559, 560 (5th Cir. 1957); see <u>Cohan v. Commissioner</u>, 39 F.2d 540, 543-544 (2d Cir. 1930).

Based on the foregoing, we hold that petitioner had unreported sales income from Brian and Ted P. and Howard S. in 1989 of $12,929 (i.e., $18,300 gross receipts less $5,371 in costs of goods sold).

Respondent determined that petitioner had unreported income of $300 in 1989 from the sale of tickets and tapes to an individual named David M.  In August of 1989, David M. wrote a check to petitioner individually for $300 for the purchase of tickets to the Broadway show "Phantom of the Opera".  Petitioner, however, has provided a receipt showing that she paid $300 for those tickets.  She accordingly has no unreported income from the

transaction with Mr. M., and respondent's determination is not sustained.[14]

Respondent determined that petitioner had unreported income of $110 in 1989 from the sale of tickets and tapes to an individual named Paul H. In September of 1989, Paul H. wrote a check to Real Services in the amount of $110, in payment for prerecorded music tapes. Petitioner deposited this check into Real Services' checking account. Respondent concedes that petitioner is entitled to a cost-of-goods-sold allowance of $12 with respect to these tapes. We accordingly find that petitioner had unreported income of $98 in 1989 from this transaction and sustain respondent's determination to that extent.

B.  1990 Sales of Electronics and Rental Income

Respondent determined that petitioner had unreported income of $3,000 in 1990 from the sale of additional electronic equipment to Ted and Brian P. Brian P. confirmed this amount at trial. From numerous receipts, petitioner has identified the items that she purchased and resold to Ted and Brian P. The receipts indicate that her cost for this electronic equipment

---

[14] Petitioner claims an additional $250 exclusion from income, relying upon documentary evidence that she paid that amount for tickets to the Broadway show "M. Butterfly". The case of Mr. M. indicates, however, that petitioner charged her customers what she paid for Broadway tickets. There is no basis to assume otherwise in the case of the tickets for "M. Butterfly". Absent some proof to the contrary, we believe that petitioner received full payment for those tickets, offsetting the amount she used to buy them. There is thus no taxable event.

totaled $2,628.[15]  Accordingly, we conclude that petitioner is entitled to a cost-of-goods-sold allowance of $2,628 with respect to the $3,000 in sales to Ted and Brian P. and sustain respondent's determination only to the extent of $372.

Respondent determined that petitioner had unreported income of $2,775 in 1990 from the sale of additional electronic equipment to Howard S.  Howard S. paid petitioner $2,775 for electronic equipment in that year.  Petitioner sold him a 52-inch rear-projection television and two answering machines.  The rear-projection television cost $2,902, including taxes and shipping, while the answering machines cost her $210.[16]  As petitioner has shown that she had product costs for goods transferred to Mr. S. in 1990 that exceed the amount that respondent determined was paid to her by Mr. S., we conclude that petitioner has demonstrated error in respondent's determination and do not sustain it.

---

[15] Petitioner's brief overstates by $100 the cost of equipment purchased on Feb. 22, 1990, and resold to Ted and Brian P.

[16] Mr. S.'s complaint in his previously noted lawsuit against petitioner states that he never received the projection television set.  His later affidavit states, however, that he received the set, but that it was in defective condition and he never received a replacement.  Petitioner has submitted evidence of the purchase of the set, its delivery to Mr. S., and two service calls to repair the set.  On this record, we conclude that Howard S. paid for and received a 52-inch rear-projection television.

Respondent determined that petitioner had unreported income of $1,400 in 1990 from the sale of electronics to an individual named Kenny T. We find, however, that she neither made nor lost money on these sales. She sold Mr. T. a video cassette recorder and a television for the same amount she was required to pay her supplier for these items. Although the television was returned to the supplier for a credit equal to what petitioner (and Mr. T.) had paid, there is no evidence or suggestion that petitioner retained the $1,200 that Mr. T. had paid her. We accordingly do not sustain the determination.

Petitioner also paid $1,147 for items that she asserts she provided to Jennifer R. in repayment of a loan in 1990. Although petitioner has presented receipts showing her purchases in these amounts, we have only her self-serving testimony that these items were delivered to Ms. R., and Ms. R. is deceased.

Respondent determined that petitioner had unreported income of $2,800 in 1990 from the rental of an apartment to an individual named Terri D. Petitioner concedes receiving $2,800 in 1990 for the short-term rental of the apartment on W. 58th Street but asserts that it was paid to Real Services and is not income to her individually. Because we have elsewhere concluded that Real Services should be disregarded for tax purposes, we hold that the $2,800 is taxable income to petitioner and sustain respondent's determination.

V.  Whether Petitioner May Deduct Business Expenses in Excess of
Those Allowed by Respondent

    A. Business Expenses in 1989

    Petitioner maintains that, if we find that she was engaged
in providing escort services, respondent has failed to allow her
a sufficient deduction for the amounts she was required to pay to
the women she arranged to engage in those services.  Petitioner
strenuously denies that she was engaged in providing escort
services.  Nevertheless, she argues in the alternative that if we
find she was engaged in such a business, we should allow her to
deduct 50 to 60 percent of the gross receipts in recognition of
the fact that she was required to pay the women who actually
rendered the services.

    Under certain circumstances, where a taxpayer establishes
his entitlement to a deduction, but does not establish the amount
of the deduction, we are permitted to estimate the amount
allowable.  Cohan v. Commissioner, supra.  In so doing, we bear
heavily against the taxpayer, who is responsible for the
uncertainty.  Id. at 543-544.  In this case, respondent has
allowed a deduction equal to 31.64 percent of the amount
determined as escort income in 1989 as specific expenses of
petitioner's escort business.  Petitioner has failed to establish
that she is entitled to larger deductions than those allowed by
respondent.  We therefore hold that she may deduct, as business

expenses, 31.64 percent of the amounts that we have held were unreported escort income for 1989.

Petitioner asserts and respondent concedes that during 1989 petitioner incurred rental expenses of $7,763 and an electricity expense of $302 with respect to the apartment on E. 65th Street, at which petitioner's escort business was conducted. We hold that she is entitled to deduct these amounts as business expenses in 1989.

During 1989, petitioner lived in the apartment at E. 77th Street. She had a room in that apartment in which she conducted office business and in which, to some extent, escort services were provided. She now claims one-third of the rentals paid for that apartment during 1989 as a home office deduction.

In general, a taxpayer is not entitled to deduct any expenses related to the use of a dwelling unit used by the taxpayer as a residence during the taxable year. See sec. 280A. The statute provides an exception to this general rule, however, if the expenses are allocable to a portion of the dwelling which is used exclusively on a regular basis as the principal place of business for the taxpayer's trade or business. Petitioner's claims that the room was used exclusively for business purposes and that it was her principal place of business rest entirely on her own testimony which, as we have concluded elsewhere, should

not be given any credence.  Accordingly, we hold that she is not entitled to the claimed home office deduction for 1989.[17]

Respondent has conceded that during 1989 petitioner incurred deductible business expenses of $825 for office expenses, bank charges, printing expenses, and travel.  Petitioner has claimed that she is entitled to deduct other expenses in addition to those conceded by respondent.  She has borne her burden of proving that she is entitled to deduct additional printing costs of $24 and miscellaneous costs paid to contractors of $132.

Petitioner further claims a deduction of $5,220 in 1989 for telephone service.  She claims that she maintained one personal telephone line and two business lines, located in two of her apartments, and seeks deductions with respect to the claimed business lines.[18]  She has offered as proof cancelled checks and receipts from the telephone company.  We are not convinced that she made payments in the amounts claimed.  The records proffered for each of the claimed business telephone lines contain cancelled checks that are duplicates of those submitted in

---

[17] Petitioner also claims a deduction of 3 months' rent in the summer of 1989 when she allegedly provided a home to Jane M. in order to move Ms. M. out of the apartment on E. 65th Street. Petitioner has not established that this was legitimately a trade or business expense, and accordingly we do not allow the claimed deduction.

[18] Sec. 262(b) provides that, in the case of individuals, charges for basic local telephone service with respect to the first telephone line provided to a residence are nondeductible personal expenses.

support of deductions for the other line. Moreover, the records do not distinguish whether the telephone charges were for local or long distance service.

The magnitude of the telephone expenses petitioner seeks to deduct suggests to us that significant long-distance charges are included in the figure. The documentation proferred by petitioner generally does not indicate what portion of the charges was for long-distance, nor has she proven a business purpose for significant long-distance charges. However, we are persuaded that petitioner's escort business almost certainly involved the use of local telephone service to arrange appointments. In these circumstances, we allow a deduction of $600 for local telephone expenses at the locations where she conducted her escort business during 1989. See Cohan v. Commissioner, supra.

The deduction of other claimed expenses for 1989 requires closer examination. The allowance of travel and entertainment business deductions described in section 274 are subject to strict rules of substantiation. Section 274(d) provides that, unless the taxpayer complies with these rules, no deductions shall be allowed with respect to "any traveling expense (including meals and lodging away from home)," or "for any item with respect to an activity which is of a type generally considered to constitute entertainment". The rules require the

taxpayer to substantiate by adequate records or by sufficient evidence to corroborate the taxpayer's own testimony: (a) The amount of the expenditure, (b) the time and place of the expenditure, (c) the business purpose of the expenditure, and (d) the business relationship to the taxpayer of the person being entertained.

For 1989, petitioner claims a business expense deduction of $180 for the cost of meals billed through the Vassar Club. Inconsistencies between the handwritten and printed receipts from the Vassar Club, however, prevent us from finding that she has adequately substantiated the business meal deductions claimed. Nor has she adequately demonstrated the business purposes of claimed travel expenses totaling $343 for separate trips in 1989 to Florida and to Washington, D.C.

Petitioner also claims deductions in 1989 for $3,000 in legal and professional fees paid to the law firm of Saltzman & Holloran and to the Prentice-Hall Financial Service relating to the incorporation of Real Services. She also seeks to deduct the filing fees charged for such incorporation. Assuming arguendo that the claimed expenses of incorporating a corporation found to be a sham for tax purposes have a business purpose, these expenses would nevertheless not be deductible in 1989;[19] these

---

[19] Organizational expenses incurred and paid by a corporation can be amortized at its election over a 60-month
(continued...)

costs, which petitioner incurred in connection with the acquisition of a capital asset--that is, the stock of Real Services--are capital in nature and not currently deductible. See Woodward v. Commissioner, 397 U.S. 572, 575 (1970); Briarcliff Candy Corp. v. Commissioner, 475 F.2d 775, 781 (2d Cir. 1973), revg. on other grounds and remanding T.C. Memo. 1972-43; Lychuk v. Commissioner, 116 T.C. 374, 389 (2001).

The situation is different, however, with respect to the other $1,000 in legal fees claimed by petitioner. Those fees, incurred by petitioner against charges that she was using the apartment on E. 77th Street for an illegal purpose, were incurred in connection with the preservation of the income-producing activities associated with her escort business and are deductible. See Johnson v. Commissioner, 72 T.C. 340, 348 (1979).

Petitioner also maintains that she entered into a real estate brokerage agreement with her sister and another individual, who were owners of some valuable real estate in Hawaii. She argues that this arrangement resulted in her making deductible expenditures during either 1989 or 1990.[20] Even if we accept petitioner's contention that she had a valid broker's

---

[19](...continued)
period beginning when its business commences. Sec. 248.

[20] Although petitioner contends that the expenditures were incurred in 1989, she claims deductions for them in 1990.

agreement to sell the property, and, further, that she spent substantial sums in preparing the property for sale, she has failed to demonstrate that she is entitled to deduct any of the claimed expenditures in either 1989 or 1990.  Deductions are a matter of legislative grace, and a taxpayer claiming a deduction bears the burden of clearly showing that the terms of the applicable statute have been satisfied.  INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); Holmes v. United States, 85 F.3d 956 (2d Cir. 1996); Stark v. Commissioner, T.C. Memo. 1999-1.

Petitioner initially claims that she may deduct these expenditures as business expenses under section 162 or as expenses for the production of income under section 212.  Here, however, the details concerning the property in Hawaii and its disposition are too vague and contradictory to support such deductions.  For example, there is evidence that, in May of 1990, petitioner's sister in Hawaii sent petitioner $1500 in the form of credit from a bank in Hawaii.  On brief, petitioner maintains that she received this $1,500 "back in regard to expenses paid." This suggests that the amounts petitioner expended upon the property in 1989 were loans or advances to her sister, rather than expenses of her own.  She has not demonstrated otherwise, and we hold that she is not entitled to deduct the claimed expenditures under either section 162 or 212 in 1989 or 1990.

Petitioner alternatively claims a deductible loss in 1990 based upon her ultimate failure to recover these expenditures. She explains that when the property did not sell, it was foreclosed upon. Section 165(a) allows a deduction for "any loss sustained during the taxable year and not compensated for by insurance or otherwise." To be claimed as a deduction, a loss must be evidenced by a closed or completed transaction. United States v. S.S. White Dental Manufacturing Co., 274 U.S. 398, 401 (1927); Ramsay Scarlett & Co. v. Commissioner, 61 T.C. 795, 807 (1974), affd. 521 F.2d 786 (4th Cir. 1975); sec. 1.165-1(b), Income Tax Regs. If the taxpayer has a claim for reimbursement of a loss and there is a reasonable prospect of recovery, the loss is not deductible until it can be ascertained with reasonable certainty whether or not the reimbursement will be received. Ramsay Scarlett & Co. v. Commissioner, supra; Julicher v. Commissioner, T.C. Memo. 2002-55; sec. 1.165-1(d)(2)(i) and (3), Income Tax Regs. The evidence before us, although far from clear, indicates petitioner was being repaid some amounts of these expenditures in 1990, the year for which she claims the loss, and, further, that the foreclosure did not take place until 1991, 1 year later than the year for which she claims the loss. The return of $1,500 of her expenditures in 1990 suggests that she had a reasonable prospect of recovery for the claimed loss in the year for which the deduction is claimed; petitioner has not

proven otherwise.  Alternatively, the fact that foreclosure did not occur until 1991 indicates that there was no closed or completed transaction in 1990.  Accordingly, we hold that petitioner has failed to demonstrate that she is entitled to deductions from income tax with respect to the property in Hawaii.

B.  Business Expenses in 1990

Petitioner also claims a deduction in 1990 for the amounts she was required to pay the women who provided escort services pursuant to her arrangements, equal to 50 to 60 percent of gross receipts.  Respondent has allowed a deduction equal to 27.04 percent of the amount determined as escort income in 1990 as specific expenses of petitioner's escort business.  On the same basis as our conclusions for 1989, we find that petitioner has failed to establish that she is entitled to larger deductions than those allowed by respondent.  We therefore hold that petitioner may deduct 27.04 percent of the amounts we have held were unreported escort income for 1990.

Petitioner also claims as deductions $220 allegedly paid to third-party contractors in 1990.  The record, however, fails to provide sufficient substantiation for us to permit this deduction.

Petitioner asserts, and respondent concedes, that petitioner is entitled to a deduction for rent of $3,600 and utility

expenses of $223 in 1990 with respect to the apartment on W. 58th Street.

Petitioner continued to rent the apartment on E. 65th Street for business purposes during 1990.  She asserts, and respondent concedes, that she is entitled to a deduction for rent of $13,983 and utility expenses of $790 in 1990 with respect to the apartment on E. 65th Street.

In 1990, petitioner continued to live in the apartment on E. 77th Street.  As was the case for 1989, however, we do not accept her uncorroborated testimony regarding exclusive business use of the furniture or any portion of the space.  She has thus failed to demonstrate that she is entitled to any business-related deductions for 1990 rental costs of this property.  Petitioner has also failed to prove to our satisfaction that $857 of furniture she claims to have purchased in 1990 was used in her trade or business and thus could be deducted as a business expense or in the form of depreciation deductions.  See secs. 162(a), 167(a).

Respondent has allowed petitioner $100 for messenger expenses in 1990 and an additional $114 in shipping and mailing expenses.  Petitioner has satisfied us that she is entitled to claim an additional $12.60 in mailing expenses, but she has not provided substantiation for an additional claimed $114.75 for such expenses.

Respondent has also conceded that petitioner may claim, as business expenses, monthly bank service charges totaling $220 in 1990 on Real Services' checking account. She claims that she should be allowed to deduct additional service charges imposed on her personal account, but she has failed to substantiate to our satisfaction either the amount of these claimed expenses or their business purpose. Petitioner has also failed to meet the substantiation requirements of section 274 with respect to a claimed traveling expense deduction in 1990 of $92.

Petitioner further claims a deduction of $4,064.10 for telephone service in 1990. As was the case for 1989, her documentary evidence is duplicative and unclear, and there is generally no basis to distinguish between local and long-distance charges. We are persuaded, however, that local telephone service was utilized by petitioner to conduct her escort business. Again exercising our discretion under the Cohan rule, we hold that she may deduct $600 in 1990 for local telephone expenses at the locations where she conducted her escort business in that year.

Petitioner may deduct additional legal fees of $1,650, incurred in 1990 by her in defense against charges that she was using the apartment on E. 77th Street for an illegal purpose, because they were incurred in connection with the preservation of her income-producing activities and are deductible. See Johnson v. Commissioner, 72 T.C. at 348. Similarly, she has demonstrated

that the amount of $400, paid to an attorney in connection with obtaining a lease for the W. 58th Street apartment, is properly deductible, because, as we have found above, she used that apartment for income-producing purposes.

Petitioner's testimony and the introduction of a cancelled check indicates that she paid her brother $150 in 1990 for appraisal fees concerning some property in Ohio that was inherited from their father. Petitioner argues that she, as Real Services, might have been interested in selling the property at a profit and is therefore entitled to deduct this $150. As was the case with the 1989 Hawaiian property expenditures, however, petitioner has failed to show that the $150 qualifies as a deduction. She testified that, when the property was sold, "Real Services was returned $175 in regard to this loan". It thus appears that her check for $150, rather than being a deductible expense, was a loan or advance to her brother.

C. <u>Interest Deductions in 1990</u>

Petitioner borrowed money from a number of people in 1990 and now claims that she should be allowed to deduct the interest she paid to her lenders. Petitioner, however, has failed to establish that she actually paid such interest. As noted above, she borrowed $4,000 from Michael L. and, a few months later, wrote him a check in repayment of $4,800. But the repayment check was dishonored, and Mr. L. acknowledged that his loan was

"most probably" repaid in the form of escort services. We held that petitioner derived $4,000 in escort income from this transaction. This evidence does not demonstrate that petitioner is entitled to an interest deduction.

Petitioner also claims a deduction for interest paid to Vania W., as a result of a $2,500 "loan" made to her by Ms. W. "for investment purposes" in February 1990. However, the documents petitioner offered in support of the claimed interest payments are not competent evidence for this purpose,[21] and Ms. W. did not testify. Petitioner has failed to prove the amount of any repayment to Ms. W. that may have occurred, or the amount of principal repayment versus interest.

Petitioner claims a $200 interest deduction with respect to a loan from Phillip B., but undercuts that claim with other testimony to the effect that this loan was to be one with "no interest". She additionally claims that, if we find that she was in the escort business, she is entitled to an interest deduction of $875 for escort services provided to Ronald K. His testimony, however, is that she provided the services (less frequently than she now claims) only as a favor. Once again, this testimony fails to support a finding that petitioner incurred a deductible

---

[21] Ms. W.'s written statements regarding repayment were excluded as hearsay, and the checks that petitioner claims reflect repayment to Ms. W. were made out to petitioner herself or cash.

interest expense. Finally, the testimony of Tammy M., one of the women who provided escort services to customers pursuant to petitioner's arrangements, fails to establish that petitioner paid interest with respect to any loan from Ms. M. Ms. M. lent petitioner $6,000, and respondent concedes that petitioner wrote checks in repayment totaling at least $6,070. Ms. M. testified, however, that many of petitioner's repayment checks were dishonored. She also testified that, while she may have recovered the amount of her loan to petitioner, she received no more than that. We thus cannot find that petitioner has established her entitlement to a deduction for interest from her dealings with Ms. M.[22]

## VI. Whether Petitioner Has Unreported Income in 1991 and 1992

For the last 2 years in issue, 1991 and 1992, respondent determined that petitioner had unreported income by reconstructing her income using cost-of-living survey information published by the Bureau of Labor Statistics (BLS). Respondent employed this data to determine that petitioner had a cost of

---

[22] In addition to claiming deductions for interest, petitioner also claims deductions for the repayment of principal in various instances. There is no legal basis for her to deduct repayments of principal per se. Our findings of unreported income to petitioner from embezzlement, however, have excluded amounts she repaid. Petitioner has thus received the benefit of her repayments for tax purposes where appropriate. See Collins v. Commissioner, 3 F.3d 625 (2d Cir. 1993), affg. T.C. Memo. 1992-478.

living--and, hence, net income--of $16,766 for 1991 and $17,461 for 1992.

We have approved the Commissioner's use of cost of living statistics, such as BLS survey statistics, to reconstruct the amount of a taxpayer's income. We explained in Giddio v. Commissioner, 54 T.C. 1530, 1533 (1970):

> Where * * * there is evidence of taxable income but no information can be acquired to ascertain the amount of such income, we do not think it is arbitrary for the Commissioner to determine that the taxpayer had income at least equal to the normal cost of supporting his family. [Citation omitted.]

As noted earlier, respondent's determinations are presumptively correct. Rule 142(a). In cases involving the Commissioner's determination of unreported income, however, the presumption of correctness may not attach if the notice of deficiency is unsupported by any evidence. Schaffer v. Commissioner, 779 F.2d 849, 858 (2d Cir. 1985), affg. in part and remanding in part Mandina v. Commissioner, T.C. Memo. 1982-34. Thus, in unreported income cases, imposition of the burden of proof upon the petitioner requires that the "record must at least link the taxpayer with some tax-generating acts". Llorente v. Commissioner, 649 F.2d 152, 156 (2d Cir. 1981), affg. in part and revg. and remanding in part 74 T.C. 260 (1980). In the absence of evidence linking the taxpayer with such acts, a notice of deficiency will be found arbitrary, insofar as it covers periods for which there is no evidence of direct involvement. Id.

In this case, petitioner disputes respondent's determination of unreported income for 1991 and 1992, claiming that there is no reliable evidence that she earned taxable income in those years. To the contrary, she maintains, after 1990 she abandoned her business activities and moved in with family members who supported her.

Evidence linking petitioner to taxable income for 1991 and 1992 is no more than tenuous. Revenue Agent Schnorbus, who examined petitioner's tax liability for the years in issue, testified that the majority of the parties he interviewed told him that they did not have dealings with petitioner in 1991 or 1992. Agent Schnorbus was not aware of any bank accounts which reflected that petitioner earned income or had a business in 1991 or 1992.

Agent Schnorbus indicated that he believed that two of petitioner's associates, Jeffrey F. and Richard S., had told him that they had engaged in business activities with petitioner during 1991 and 1992. Agent Schnorbus conceded, however, that neither had provided canceled checks nor other documents showing that there were any such dealings in those 2 years. Moreover, although respondent introduced notes of an interview that Agent Schnorbus had conducted with Mr. F., those notes make no reference to petitioner's receipt of income for 1991 or 1992. Finally, Agent Schnorbus stated that although he had made notes

of the interview with Mr. S., those notes had been lost before trial.

Both Mr. F. and Mr. S. testified at trial. Mr. F. stated that he referred business clients to an "Angel" for escort services "probably sometime between––sometime between '82 and '92." He later added, "somewhere in around there." He did business with the escort service for "6 or 7 years." At trial, however, Mr. F. failed to identify petitioner as the "Angel" to whom he sent his clients. On cross-examination, petitioner asked Mr. F. if he could have stopped using the escort services prior to 1989. He replied: "It's possible. I don't think so, but it's possible."

Similarly, at trial, respondent's counsel asked Mr. S.: "Did you engage in any business transactions with Ms. Pappas during the years 1989 through 1992, sir?" Mr. S. replied: "Yes, I did." He identified the nature of those business transactions as "sexual favors". When asked specifically about 1989, however, Mr. S. replied: "I can't guarantee that it was 1989. I just * * * don't remember back that far." On cross-examination, petitioner asked Mr. S. whether the events in his narration to the IRS could have occurred prior to 1989. He replied: "It's possible." She also asked "So in fact all of this activity could have occurred prior to 1989?" Mr. S. replied: "Could have."

Mr. S.'s testimony also establishes that he abused alcohol during the periods in which he engaged in transactions with petitioner.

In the final analysis, the record in this case shows that the examining agent believed that two individuals had informed him of business dealings with petitioner in 1991 and 1992, although the majority of his contacts did not support that contention. There are no checks or other contemporaneous documentation in the record connecting petitioner to the receipt of taxable income in those years. The two individuals who provided the basis for respondent's assertion of income in those years both conceded at trial that it is possible that their business with petitioner had taken place at other times. The evidence thus only shows that petitioner possibly engaged in an income-generating activity in 1991 and 1992, not that she actually did so. The notice of deficiency therefore lacks the evidentiary support needed to sustain the determination of income based upon BLS data for 1991 and 1992. Respondent's determinations for those 2 years are therefore not sustained.

VII. Whether Petitioner Is Liable for the Addition to Tax Under Section 6651(f) or, in the Alternative, for the Addition to Tax Under Section 6651(a), for the Years in Issue

Sections 6011 and 6012 require every individual who has gross income in excess of certain amounts for a taxable year to file an income tax return. Section 6651(a)(1) provides for an addition to tax for failure to file a timely return. The

addition to tax is equal to 5 percent of the amount required to be shown as tax on the return, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate. If, however, the failure to file any return is fraudulent, then the addition to tax is equal to 15 percent of the amount required to be shown as tax on the return, with an additional 15 percent for each additional month or fraction thereof during which such failure continues, not exceeding 75 percent in the aggregate. Sec. 6651(f). Respondent has determined that petitioner's failure to file for the years in issue was fraudulent.

The Commissioner must prove fraud by clear and convincing evidence. See sec. 7454(a); Rule 142(b); Clayton v. Commissioner, 102 T.C. 632, 646 (1994). In determining whether petitioner's failure to file was fraudulent within the meaning of section 6651(f), we consider the same elements that are relevant in imposing the penalty for underpayment of tax due to fraud under section 6663. Clayton v. Commissioner, supra at 653.

Establishing fraud requires proof that the taxpayer "acted with an intent to evade paying taxes" and may be proved by circumstantial evidence. Douge v. Commissioner, 899 F.2d 164, 168 (2d Cir. 1990), affg. in part and revg. in part and remanding an order of this Court dated June 6, 1988. "Such evidence may include (1) consistent and substantial understatement of income,

(2) failure to maintain adequate records, (3) failure to cooperate with an IRS investigation, (4) inconsistent or implausible explanations of behavior and (5) awareness of the obligation to file returns, report income and pay taxes." Id.

An application of these criteria to petitioner's situation demonstrates convincingly that in failing to file tax returns for 1989 and 1990 she intended to evade paying taxes and therefore committed fraud. We have found that she received, and knew she had received, gross income sufficient to require filing returns for 1989 and 1990. Petitioner has consistently and substantially understated her income. Part of her defense in this case has been her claim that Real Services, rather than herself, was the recipient of the income at issue. However, no corporate income tax returns were filed on behalf of Real Services. She had not maintained adequate records; the three pages of handwritten notes and a cluster of receipts are inadequate under any definition. Petitioner has contended that most of her business records were stolen, but we do not believe her. She has not cooperated with the Internal Revenue Service investigation; instead, petitioner has manifested a persistent pattern of obstruction, confrontation, and inattention with respect to respondent's attempts to determine the correct amount of her taxable income for the years in issue. She has been equally persistent in advancing implausible explanations for her failure to report her

income and to pay taxes thereon. Her excuses include the improbable contention that her now-deceased attorney informed her that she was not required to file personal or corporate tax returns, her tales of theft of records, and her steadfast denials that she earned any income from an escort business. She also altered a document in a material respect that she sought to introduce as evidence in this case. These dubious claims and actions are the kinds of implausible or deceitful representations that serve as circumstantial evidence of fraud. Finally, petitioner's actions in these proceedings reveal that she is intelligent, shrewd, and experienced in financial matters. Her efforts to interpose a sham corporate entity between herself and her tax obligations confirm this view. We conclude that she was aware of her obligation to file tax returns and pay tax for 1989 and 1990, and that her failure to do so was a willful attempt to evade those responsibilities, which is fraudulent within the meaning of section 6651(f).[23]

For the taxable years 1991 and 1992, however, it has not been established that petitioner had sufficient gross income to require the filing of income tax returns. It follows that she is not liable for any addition to tax under section 6651 for those years.

---

[23] Because we conclude that petitioner's failure to file in 1989 and 1990 was fraudulent, we need not address respondent's alternative determinations under sec. 6651(a).

VIII.  Whether Petitioner Is Liable for the Addition to Tax Under
Section 6654(a) for the Years at Issue

Respondent also determined additions to tax for 1989 through 1992 under section 6654 arising from an underpayment of estimated taxes.  This addition to tax is mandatory absent a showing by petitioner that one of the specified statutory exceptions applies.  See Clayton v. Commissioner, supra (citing Grosshandler v. Commissioner, 75 T.C. 1, 20-21 (1980)).  Petitioner has made no such showing for her 1989 and 1990 taxable years, and we therefore sustain the additions to tax provided in section 6654 for those years.  Section 6654(e) provides, however, that no addition to tax for underpaid estimated taxes shall be imposed if the tax "is less than $500."  We have found that petitioner is not liable for income tax for the years 1991 and 1992.  Accordingly, the determination of additions to tax under section 6654 for those 2 years is not sustained.

In view of the foregoing,

Decision will be entered

under Rule 155.